John M. BREDEHOFT & Elaine C. Bredehoft, Appellants,

v.

Richard ALEXANDER, et al., Appellees.

No. 95–CV–1492.

District of Columbia Court of Appeals.

Argued Nov. 7, 1996.

Decided Dec. 23, 1996.

---

Mark W. Foster, Washington, DC, with whom Cyril V. Smith was on the brief, for appellants.

David G. Fiske, with whom Philip J. Harvey and Michael J. Wendorf, Washington, DC, were on the brief, for appellees.

Gary Howard Simpson, Bethesda, MD, and Woodley B. Osborne, Washington, DC, filed a brief for the Metropolitan Washington Employment Lawyers Association as amicus curiae.

Before TERRY and KING, Associate Judges, and NEWMAN, Senior Judge.

KING, Associate Judge:

In this case we are asked to decide whether an attorney's prefiling inquiry, made before a civil complaint was filed, was sufficient to preclude the imposition of sanctions under Super. Ct. Civ. R. 11; whether a trial court could impose a sanction under the former Rule 11 against an attorney who conducted the prefiling investigation but did not sign the complaint, and, if not, whether the court could otherwise sanction the nonsigning attorney without a finding of bad faith. We conclude that the trial court erred in finding that the prefiling inquiry here was insufficient; that under Rule 11, before it was amended in 1995, a sanction could be imposed only upon an attorney who signed the filed court papers; and that, apart from the rule, the trial court could impose a sanction

upon the nonsigning attorney for that attorney's prefiling investigation only upon a finding of bad faith, which was not made here. Accordingly, because the trial court abused its discretion in awarding Rule 11 sanctions against the two appellant-attorneys, we reverse.

## I. The Case

The circumstances leading to the award of Rule 11 sanctions in this case originated in a civil action filed by John M. Bredehoft, Esquire, a member of the bar of this court, on behalf of Frank L. Cerutti, formerly President and Chief Executive Officer ("CEO") of Madison National Bank of Virginia ("Madison") against Richard Alexander, *et al.*, partners in the law firm Arnold & Porter ("Arnold & Porter"), in the Superior Court of the District of Columbia on November 6, 1991. Mr. Cerutti had been fired from his post with Madison after its Board of Directors ("Board") received a report relating to Mr. Cerutti's conduct, that had been prepared by Arnold & Porter. Based on a prefiling investigation by Elaine C. Bredehoft, Esquire, a member of the bar of Virginia, Mr. Cerutti alleged in his complaint that Arnold & Porter maligned him, interfered with his contractual expectations, and committed intentional infliction of emotional distress, negligent infliction of emotional distress, negligent breach of duty, and statutory conspiracy against him. The complaint was signed by John Bredehoft, but not Elaine Bredehoft.[1] On March 15, 1993, the trial court granted summary judgment for Arnold & Porter, which this court affirmed in an unpublished Memorandum Opinion and Judgment on April 12, 1994.

On April 23, 1993, after summary judgment was granted by Judge Robert Shuker but before this court's April 12, 1994 affirmance of that judgment, Arnold & Porter moved for sanctions against both of the Bredehofts. On June 28, 1993, Judge Shuker died, and the motion for sanctions was there-

after assigned to Judge Zinora M. Mitchell-Rankin.

On June 29, 1994, after reviewing the parties' briefs and the filings before Judge Shuker, and concluding that the Bredehofts had violated Rule 11 when Mr. Bredehoft filed Mr. Cerutti's complaint against Arnold & Porter, the judge ordered that sanctions be imposed against the Bredehofts. The Bredehofts filed a timely motion, pursuant to Super. Ct. Civ. R. 59(e), for reconsideration. On September 1, 1995, as amended by her order of October 13, 1995, Judge Mitchell-Rankin granted the Bredehofts' motion to reconsider, but affirmed her previous order and imposed a $75,000 sanction against the Bredehofts, and awarded $20,000 in costs against Mr. Cerutti.[2] This appeal followed.

## II. Amended Rule 11

During the course of the proceedings in this case, Rule 11 was amended in such a manner that resolution of the issues presented here could be affected depending upon which version of the rule is applied. Therefore, we must first determine whether the earlier version or the amended version of the rule governs. The effective date of the amendment was June 1, 1995, after the Bredehofts' motion for reconsideration was filed (July 19, 1994), but before the trial court ruled on that motion (September 1, 1995).

This question is controlled by *(Annie A.) Montgomery v. District of Columbia,* 598 A.2d 162, 166 (D.C.1991). "[B]y the general rule of law, the procedure in an action is governed by the law regulating it at the time any question of procedure arises." *Id.* (quoting *Lazarus v. Metropolitan Ry. Co.,* 145 N.Y. 581, 585, 40 N.E. 240, 241 (1895)). Therefore, because the former Rule 11 was in effect at the time of the filing of the complaint, the pleading that triggered the sanction, the former Rule 11 applies to the issue presented here.

---

1. Ms. Bredehoft "participated in the action as counsel pro hac vice." We are informed that Ms. Bredehoft has been a member of the Virginia Bar since 1984, and that she was admitted to the D.C. Bar on April 1, 1994, thirty months after the complaint was filed.

2. Mr. Cerutti paid these costs. He is not a party to this appeal.

## III. Ms. Bredehoft's Rule 11 Sanction

■ Ms. Bredehoft contends that she is not subject to a Rule 11 sanction because she did not sign the filed papers. In pertinent part, the old Rule 11 provided that:

The signature of an attorney or party constitutes a certificate by the *signer* that the *signer* has read the pleading, motion or other paper; that to the best of the *signer's* knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading, motion, or other paper is *signed* in violation of this Rule, the Court, upon motion or upon its own initiative, shall impose upon the person who *signed* it . . . an appropriate sanction. . . .

Super. Ct. Civ. R. 11 (1995 ed.) (emphasis added).

The Supreme Court has held, in interpreting the federal counterpart of Rule 11, that a sanction based on a prefiling violation can only be applied to an individual who signs the filed court papers.[3] *Pavelic & LeFlore v. Marvel Entertainment*, 493 U.S. 120, 125–26, 110 S.Ct. 456, 459–60, 107 L.Ed.2d 438 (1989) (individual attorney who signed court papers, not signing attorney's law partners, is accountable for Rule 11 violation). Although we have never directly resolved this point, our cases are essentially consistent with that holding. *Chevalier v. Moon*, 576 A.2d 722, 723 (D.C.1990) (trial court erred when it imposed Rule 11 sanctions based on oral representations before the court, but award affirmed on other grounds); *see also Kleiman v. Aetna Cas. & Sur. Co.*, 581 A.2d 1263,

1266 (D.C.1990) (Rule 11 sanction is improper where it is based on post-filing activity).

Therefore we hold, under the pre–1995 amendments to Rule 11, that Ms. Bredehoft cannot be subject to a Rule 11 sanction because she did not sign the complaint.

## IV. Ms. Bredehoft's "Bad Faith" Sanction

· ■ We also agree with Ms. Bredehoft that the trial court made no finding of bad faith that would allow it to sanction her, based on the court's "authority to impose sanctions," in accordance with *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 2133–34, 115 L.Ed.2d 27 (1991). The trial court did specify a number of factors[4] it considered justified the imposition of a sanction against Ms. Bredehoft pursuant to its inherent authority, even though she did not sign Mr. Cerutti's complaint. While *Chambers* affirms a trial court's inherent power to "punish by contempt or to discipline an attorney," there must first be a showing of bad faith before the court may wield that power. *Chambers, supra*, 501 U.S. at 49, 111 S.Ct. at 2135; *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 2464–65, 65 L.Ed.2d 488 (1980).

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers, supra*, 501 U.S. at 44, 111 S.Ct. at 2132; *see also Chevalier, supra*, 576 A.2d at 724. The imposition of a sanction against an attorney pursuant to a court's inherent powers is reviewed for an abuse of discretion. *Chambers, supra*, 501 U.S. at 55, 111 S.Ct. at 2138. Because there is nothing in this record to support a finding of bad faith, as required by *Chambers* and *Chevalier*, we conclude that the trial court abused its discretion when it sanctioned Ms. Bredehoft as an exercise of its "inherent authority."

---

3. "Our rule is identical to the federal rule, and we have held that interpretations by the federal courts of an identical federal rule are persuasive authority for interpretation of the local rule." *Gray v. Washington*, 612 A.2d 839, 842 (D.C. 1992). *See also Kleiman v. Kleiman*, 633 A.2d 1378, 1382 n. 7 (D.C.1993).

4. The court found that the entire prefiling investigation of Mr. Cerutti's complaint was conduct-

ed by Ms. Bredehoft; that the reasonableness of the complaint was based on her subjective assessment of the facts, law, and issues; that while Ms. Bredehoft did not sign any of the court papers filed in this case, her name was listed on many of the filings; that she participated as counsel pro hac vice; and that she continued throughout the proceedings as counsel to Mr. Cerutti.

## V. Mr. Bredehoft's Superior Court Filing

Mr. Bredehoft argues that the Rule 11 sanction imposed on him by the trial court was based on an erroneous finding that Ms. Bredehoft's prefiling investigation was inadequate, notwithstanding Ms. Bredehoft's "extraordinary pre-filing inquiry." In addition, Mr. Bredehoft contends that the trial court effectively ruled that he could not reasonably rely on the representations made to him by his client, contrary to this court's holding in *Gray, supra,* 612 A.2d at 843 (counsel's reliance on client's representations, absent documentary records, was reasonable under the circumstances), and in spite of Arnold & Porter's actions which hindered Ms. Bredehoft's prefiling investigation.

■■■■ Rule 11 requires a "reasonable inquiry" into the facts prior to filing a lawsuit. Whether a prefiling inquiry was reasonable is determined by an objective assessment of the facts and law relied on for the filing. *Gray, supra,* 612 A.2d at 843; *(George) Montgomery v. Jimmy's Tire & Auto Ctr.,* 566 A.2d 1025, 1030 (D.C.1989); *cf. Kleiman v. Kleiman, supra,* 633 A.2d at 1383 (Rule 11 is not intended to impose sanctions against a party who based a claim on objective evidence where that evidence was rejected in favor of evidence from the opposing side). Counsel may rely on representations by a client as the basis for a filing. That reliance, however, must be based on statements or representations that are, under the circumstances, "objectively reasonable." *Gray, supra,* 612 A.2d at 842. A client's mere suspicions do not create a sufficient basis for filing a lawsuit. *Office & Prof'l Employees Int'l Union, Local No. 2 v. International Bhd. of Painters,* 580 A.2d 630, 635 (D.C.1990). Moreover,

an attorney who signs a filed court paper in reliance on a prefiling investigation conducted by another attorney is not absolved from Rule 11 liability. *In re Kunstler,* 914 F.2d 505, 515 (4th Cir.1990) ("reliance on others was indeed an improper delegation of responsibility under Rule 11 to certify that the pleading filed ... was well grounded in fact and in law"). Finally, the court must determine if the complaint was well-grounded in fact, warranted by existing law, or whether it was utilized for an improper purpose. *Williams v. Board of Trustees of Mount Jezreel Baptist Church,* 589 A.2d 901, 910 (D.C.1991); *Kleiman v. Aetna, supra,* 581 A.2d at 1266.

### A. Underlying Facts

In early 1991, the Office of the Comptroller of the Currency ("OCC"), a federal body which regulated Madison and its holding company, James Madison Limited ("JML"), performed a routine "safety and soundness" audit of Madison. This audit disclosed that Madison did not have the proper reserve allocations on a number of loans it held in conjunction with the Madison Bank of Washington, another of JML's companies. On February 5, 1991, subsequent to the OCC audit, Mr. Cerutti met with an attorney who specialized in banking matters to discuss a means for resolving the problems revealed by the OCC audit, which threatened Madison's very existence. This attorney was not associated with the Arnold & Porter law firm.

At about the same time, there were reports that OCC was investigating Arnold & Porter in connection with its representation of JML.[5] On February 6, 1991, the day after

---

5. On June 21, 1991, the Washington Post published an article reporting on Mr. Cerutti's lawsuit against Arnold & Porter. The article, published at about the time the complaint was first filed in a Virginia court, provides support for Ms. Bredehoft's conclusion that Mr. Cerutti's statements regarding Arnold & Porter's alleged motive had some merit. The article stated, in part:

Former top officials of Madison are being investigated by seven federal agencies for possible illegal activity before the failure of the banks, according to a regulatory document and sources close to Madison. Before Madison

failed, Arnold & Porter was negotiating with the [OCC] in an effort to keep Madison alive.... At the time of Madison's demise, Arnold & Porter partner G. Duane Vieth sat on the bank's board, while the law firm provided legal advice. The Federal Deposit Insurance Corp. recently has sued several law firms that provided advice to failed banks and thrifts and whose members also served as bank directors. Sources said the FDIC is reviewing Arnold & Porter's role at Madison. [Arnold & Porter] declined to comment on the law firm's role at

Mr. Cerutti had spoken with the other attorney mentioned above concerning the OCC audit, an attorney in the Arnold & Porter firm approached Mr. Cerutti to request that Mr. Cerutti act on behalf of JML and Madison before the OCC because Mr. Cerutti had established a constructive working relationship with OCC. Arnold & Porter told Mr. Cerutti that this would benefit JML and Madison, and that doing so would place Mr. Cerutti "back in the good graces" of JML. Mr. Cerutti refused. This was also the time period during which JML retained Arnold & Porter to investigate "allegations of gender discrimination, sexual harassment, and falsification of bank records which had been made against Cerutti." Attorneys with Arnold & Porter conducted this investigation and presented the findings to the Madison Board of Directors at a Board meeting on March 19, 1991. It was at this meeting, after Arnold & Porter's presentation, that the Board decided to ask for Mr. Cerutti's resignation, and, if he refused, to terminate his employment with the bank.

Mr. Cerutti believed that Arnold & Porter was motivated to retaliate against him by securing his ouster as President and CEO because he conferred with the attorney who was not associated with Arnold & Porter concerning the OCC audit of Madison, and because Mr. Cerutti refused to be JML's "mouthpiece" before the OCC. This was the context in which Mr. Cerutti formed his belief that Arnold & Porter was out to get him, and that it had purposely carried out a plan to malign him—with charges of sexual harassment, improper loan approvals, employee favoritism, and unprofessional conduct overall—before the Board. In short, Mr. Cerutti believed that Arnold & Porter was improperly motivated to persuade the Board to remove him from his position as Madison's President and CEO. Mr. Cerutti communicated these impressions to Ms. Bredehoft when he retained her.

### B. Ms. Bredehoft's Investigation

In response to Arnold & Porter's motion for sanctions, Mr. Bredehoft submitted an affidavit executed by Ms. Bredehoft in which she detailed the extent of her prefiling inquiry. In this uncontroverted affidavit Ms. Bredehoft asserted that, before the complaint was filed, she spent considerable time and effort researching Mr. Cerutti's case, that she did not solely rely upon Mr. Cerutti's representations, and that she made several attempts, with some success, to interview potential witnesses in an effort to corroborate Mr. Cerutti's claims.

For example, over a period of several months, Ms. Bredehoft interviewed approximately a dozen witnesses, and attempted to interview several more, including then current and former bank employees and Board members. However, her success in interviewing current employees and Board members, witnesses who could possibly provide additional information vital to Mr. Cerutti's claim that Arnold & Porter acted with malice against him, was frustrated by the fact that these potential witnesses were employees of Arnold & Porter's client, JML. Arnold & Porter took the position that Ms. Bredehoft's attempts to contact these witnesses constituted an ethics violation. In that regard Arnold & Porter informed her that if she did not cease her interview attempts, Arnold & Porter would take "immediate action to restrain these acts."

Ms. Bredehoft nonetheless pursued her prefiling investigation and attempted to contact employees and Board members for interviews. However, only two former Board members responded to her interview request: Donna W. Eacho and Dr. Thomas J. Neviaser who were present at the March 19, 1991 Board meeting. This meeting was also attended by two Arnold & Porter attorneys, one of whom presented Arnold & Porter's findings on Mr. Cerutti to the Board, and also made comments about Mr. Cerutti that he contends were malicious. Both of the witnesses interviewed had arrived at the Board meeting with a favorable impression of Mr. Cerutti. That impression changed by the time the presentation and meeting ended, as both witnesses left the meeting with a negative picture of Mr. Cerutti's tenure as Madison Bank's President and CEO. Both witnesses told Ms. Bredehoft that they could

Madison except to say that the firm was gener-                    al counsel to the bank.

not recall Arnold & Porter making any positive comments about Mr. Cerutti during the course of its presentation. According to Ms. Bredehoft's affidavit, Ms. Eacho also told her that "she believed that Arnold & Porter had a 'hidden' motive in making the report."

In addition, despite Arnold & Porter's warning not to speak to any Madison Bank employees, Ms. Bredehoft managed to interview one employee who informed her that a memorandum had been circulated to all bank employees informing them that they would be fired if they spoke to anyone from Ms. Bredehoft's law firm. Ms. Bredehoft concluded that this memorandum was generated at the direction of Arnold & Porter, but her efforts to obtain a copy of this memorandum were unsuccessful.

Another bank employee interviewed by Ms. Bredehoft was Richard Devaney, a loan officer at the bank who was familiar with an allegedly improper loan made to the McLean Bible Church that had been approved by Mr. Cerutti.[6] Mr. Devaney informed Ms. Bredehoft that, on behalf of the bank, he had called the church to inform it of the approved loan. Mr. Devaney also informed her that, due to an illness he was suffering at about the time he was interviewed by Arnold & Porter during its investigation of Mr. Cerutti, he could not remember the details of the loan approval notification and did not disclose this information to Arnold & Porter. From this information, Ms. Bredehoft concluded that because she:

> had been informed [by Reverend Keyes of the McLean Bible Church] that Mr. Devaney communicated approval of the loan to the Church, and since I now knew that Arnold & Porter had been told Mr. Devaney had no memory of the events after the fact, in my professional judgment I believed Arnold & Porter's omission of that fact from its report to the Board ... infer[red] malice and that Arnold & Porter misreported the results of its investigation.

Ms. Bredehoft also spoke with two women who were former Madison Bank employees. These interviews occurred after Arnold &

Porter had interviewed both women concerning the allegations against Mr. Cerutti. One woman told Ms. Bredehoft that Arnold & Porter did not ask her any questions relating to sexual harassment or religious discrimination (another of the allegations against Mr. Cerutti). The same former employee also told Ms. Bredehoft that she had informed Arnold & Porter that she did not believe that Mr. Cerutti engaged in any instances of sexual harassment. The second former employee informed Ms. Bredehoft that still another woman, a former Madison Bank employee who was Mr. Cerutti's principal accuser of sexual harassment, had told this employee that she had been spurned by Mr. Cerutti and that she was going to try to "ruin" him.

On June 21, 1991, Ms. Bredehoft filed a five-count complaint, on Mr. Cerutti's behalf, against Arnold & Porter in the Circuit Court of Fairfax County, Virginia. Before she filed it, however, Ms. Bredehoft sent a draft of the complaint to Arnold & Porter to give it "one final opportunity to dispute any of [Mr. Cerutti's] allegations [against Arnold & Porter] with concrete evidence." Arnold & Porter did not respond to Ms. Bredehoft's letter, and on April 3, 1991, Ms. Bredehoft sent a follow-up letter to Arnold & Porter requesting a response to the draft complaint. On April 5, 1991, Arnold & Porter sent a letter to Ms. Bredehoft answering her request by stating:

> You know or should know that the proposed complaint on behalf of [Mr.] Cerutti against Arnold & Porter is not well grounded in fact or law and is threatened for improper purpose. [sic] Please understand ... that Arnold & Porter intends to seek appropriate sanctions against you ... in the event that the proposed complaint is filed.... [T]he trial of the proposed litigation will do considerable damage to [Mr. Cerutti's] status with people who are important to him and his future.

During the pendency of the Virginia lawsuit, Ms. Bredehoft's efforts, during discovery, to secure additional information from Arnold & Porter to support Mr. Cerutti's

---

**6.** One of the allegations against Mr. Cerutti was that he had made a loan to the McLean Bible Church that was illegal because it had not been

approved by the Board. Mr. Cerutti contested this allegation, and asserted that the Board had in fact approved the loan.

claims were of limited success. For example, Ms. Bredehoft's discovery included requests for the names of any witnesses that would corroborate Arnold & Porter's denial of Mr. Cerutti's charges, and for any statements made by representatives of Arnold & Porter regarding Mr. Cerutti. Arnold & Porter did not respond in any substantive manner, describing the requests as "overly broad, vague and ... not reasonably calculated to lead to discovery of admissible evidence," or stating that, at present, Arnold & Porter could not respond due to the pending demurrer but would do so at a later date. The Virginia suit, after Arnold & Porter filed a demurrer, was voluntarily withdrawn, and an identical suit, with the addition of a sixth count for negligence, was then filed by Mr. Bredehoft in the Superior Court of the District of Columbia. The principal count in both actions was the count for defamation.

### C. Standard of Review

■■■■■ Where a trial court finds a Rule 11 violation due to an unreasonable prefiling inquiry, or because a complaint was filed for an improper purpose, and the court imposes a sanction on the offending party, this court reviews that finding and sanction to determine if the trial court abused its discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990); *Park v. Sandwich Chef, Inc.*, 651 A.2d 798, 802 (D.C.1994); *Gray, supra*, 612 A.2d at 842; *(George) Montgomery, supra*, 566 A.2d at 1029. " '[T]he court has a range of choice, and ... its decision will not be disturbed *as long as it stays within that range* ....' " *Kennedy v. District of Columbia*, 654 A.2d 847, 859 (D.C. 1994) (quoting *United States v. Dockery*, 293 U.S.App. D.C. 357, 361, 955 F.2d 50, 54 (1992)) (emphasis in original). "[T]he trial court has substantial leeway in determining whether a party's behavior rises to the level of a Rule 11 violation...." *Kleiman v. Aetna, supra*, 581 A.2d at 1266–67. "However, a decision based on an erroneous view of the law or a clearly erroneous evaluation of the evidence, would constitute an abuse of discretion." *Kleiman v. Kleiman, supra*, 633 A.2d at 1383.

### D. Analysis

We begin our analysis with the understanding that where a party moves for Rule 11 sanctions:

> it is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation.... In many situations the judge's participation in the proceedings provides [the judge] with full knowledge of the relevant facts and little further inquiry will be necessary.

Fed.R.Civ.P. 11 Advisory Committee note, 1983 amendments. Factual findings, whether based on oral or documentary evidence, are reviewed under the clearly erroneous standard. *American Sec. Bank v. Am. Motorists, Ins.*, 538 A.2d 736, 739–40 (D.C.1988); Super. Ct. Civ. R. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). Moreover, "[m]atters are committed to the discretion of the trial court and reviewed only for abuse of that discretion to reap the benefits of certain perspectival and institutional advantages." *Johnson v. United States*, 398 A.2d 354, 362 (D.C.1979) (abuse of discretion requiring reversal where trial court failed to follow proper discretionary constraints in denying request for severance). Finally, "[d]eference to the determination of courts on the front lines of litigation will enhance these courts' ability to control the litigants before them." *Cooter & Gell, supra*, 496 U.S. at 404, 110 S.Ct. at 2460.

■■■■ Viewing the record before us in that light, we conclude that the sum of Ms. Bredehoft's interviews and investigation prior to Mr. Bredehoft's filing in the Superior Court amounted to a "reasonable inquiry" into the facts of Mr. Cerutti's case and that the trial court's contrary finding is clearly erroneous. Ms. Bredehoft conducted approximately a dozen interviews, the results of which lent some credibility to Mr. Cerutti's claim against Arnold & Porter. While Ms. Bredehoft was not pressed for time like the attorney in *Gray*, she also did not rely solely on Mr. Cerutti's representations. Nor did she

base the complaint merely on Mr. Cerutti's "suspicions." *Office & Prof'l Employees Int'l Union, Local No. 2, supra,* 580 A.2d at 635. Rather, Ms. Bredehoft's extensive investigation, the prefiling interviews, and the inferences she drew from the facts she gathered, were sufficient to provide an "objectively reasonable" basis upon which to interpret the tone and intent of Arnold & Porter's investigation into the allegations concerning Mr. Cerutti and its March 19, 1991 presentation to the Board. Ms. Bredehoft's findings lent support to the representations made to her by Mr. Cerutti that Arnold & Porter defamed him before the Board in an attempt to oust him from his position as President and CEO of Madison Bank in retaliation for his collaboration with the non-Arnold & Porter attorney, and his refusal to represent JML before the OCC. Given the number of witnesses interviewed by Ms. Bredehoft and the information gained from those interviews, the degree of Arnold & Porter's control over documentation and witnesses critical to Mr. Cerutti's claim, and the fact that Arnold & Porter had no prefiling duty to disclose any information to Mr. Cerutti, Ms. Bredehoft's uncontroverted affidavit establishes that the representations made to her by Mr. Cerutti had a reasonable degree of corroboration, and that she was not relying merely on the suspicions of her client.

"Rule 11 sanctions are not to be imposed simply because the allegations in the challenged pleading are found wanting." *Gray, supra,* 612 A.2d at 841. In "reviewing the decision for an abuse of discretion [we] must determine 'whether the decision maker failed to consider a relevant factor, whether [she] relied upon an improper factor, and whether the reasons given reasonably support the conclusion.'" *Johnson, supra,* 398 A.2d at 365 (quoting Note, *Perfecting the Partnership: Structuring the Judicial Control of Administrative Determinations of Questions of Law,* 31 Vand.L.Rev. 91, 95 (1978)). Because we conclude the factual findings underlying the trial court's imposition of sanctions were clearly erroneous, we hold that the trial court abused discretion when it imposed a Rule 11 sanction on Mr. Bredehoft based on that finding.

## VI.

Accordingly, for the reasons stated, the trial court's order imposing sanctions against John M. Bredehoft and Elaine C. Bredehoft is

*Reversed.*