**MARLYN CONDOMINIUM, INC., et al., Appellants,**

v.

**Gary L. McDOWELL, et al., Appellees.**

**Nos. 89–286, 89–505.**

District of Columbia Court of Appeals.

Argued Jan. 24, 1990.

Decided June 28, 1990.

Roger D. Luchs, Bethesda, Md., for appellants.

Benny L. Kass, with whom Vickie L. Gaul, Washington, D.C., was on the brief, for appellees.

Before TERRY, STEADMAN, and FARRELL, Associate Judges.

STEADMAN, Associate Judge.

A serious water seepage problem threatens the structural integrity of the 121–unit Marlyn Condominium building ("the Marlyn"). Marlyn Condominium, Inc., the unit owners' association which governs the Marlyn, through its Board of Directors ("the Board"), has devised a major repair and renovation project, to be financed by special assessments imposed on each individual unit. Part of the planned project entails

---

**10.** See *supra* note 2.

removing and ultimately replacing the windows in each of the individual condominium units. However, the Marlyn's governing instruments designate windows as part of the property individually owned by each unit holder. The principal issue on appeal is whether the Board may include the replacement of any of these windows within the proposed project.[1]

I

The Marlyn Condominium is a 121–unit building on Cathedral Avenue in Northwest Washington. Built over fifty years ago, the Marlyn was converted to a condominium in 1974. By 1986, an apparent water damage problem had grown quite serious, and the Board hired an engineering firm, Engineering and Technical Consultants, Inc. ("ETC"), to ascertain the cause of water leakage and to recommend solutions to the problem.

ETC's report explained that the Marlyn's exterior wall surface consists of brick masonry; behind that is a concrete block supporting wall. Although ETC identified a variety of deficiencies in the building exterior's water displacement system, inadequate flashings between the brick facing and supporting concrete wall ranked as a chief cause of the water penetration problem.[2] ETC described the existing flashings above the Marlyn's windows as ineffective because they had grown brittle due to age, and because they do not extend to the exterior surface of the wall. Consequently, "water entering the wall system can run around the flashings and penetrate into the building." ETC also found that a good deal of water penetration originates beneath the Marlyn's windows, where no flashings had been installed. According to an ETC expert, the penetrating water is not only damaging the Marlyn's interior walls, it is also causing bricks in the exterior surface to deteriorate and steel supports within the wall system to rust and weaken. Ultimately, the water damage threatens to cause structural failure to portions of the building.

Based on ETC's report, the Board decided in 1987 to undertake a major renovation and repair project aimed at rectifying the shortcomings in the Marlyn's water displacement system. The dispute before us centers on the portion of the renovation project which entails removing the Marlyn's existing windows and replacing them with new aluminum-clad windows made by the Pella Company. The trial court found that window replacement accounted for approximately one-third of the cost of the first phase of the renovation project.

The evidence at trial indicated that at least two separate factors necessitated window replacement as part of the project. First, in order to install new flashings, the windows must be removed to provide access to the exterior wall system. Evidence at trial indicated that once removed, the original wooden windows, which had rotted and deteriorated due to long-term water penetration, could not be re-installed; they could "fall apart" if a contractor tried to put them back into the window openings.

A second reason for installing new windows relates directly to the protection of the Marlyn's interior wall system. Be-

**1.** In the consolidated Appeal No. 89–505, the Board appeals from the trial court's determination to award McDowell attorney's fees under the "common benefit" doctrine. *See Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 389–97, 90 S.Ct. 616, 624–28, 24 L.Ed.2d 593 (1970); *Passtou, Inc. v. Spring Valley Center,* 501 A.2d 8, 11–12 (D.C.1985). An award of attorney's fees is final when the trial court has "determined the quantum of attorney's fees to be paid," not when the trial court "merely establishe[s] entitlement to attorney's fees in an amount to be later determined." *Trilon Plaza Co. v. Allstate Leasing Corp.,* 399 A.2d 34, 37 (D.C.1979). Because the record does not indicate that the trial court has determined the amount of attorney's fees to be awarded to McDowell, there is no final order or judgment in Appeal No. 89–505 over which this court has jurisdiction. D.C. Code § 11–721(a)(1) (1989). Accordingly, we *sua sponte* dismiss that appeal. Notwithstanding the open issue of attorney's fees, however, the injunctive order is properly before us. D.C. Code § 11–721(a)(1); *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 202–03, 108 S.Ct. 1717, 1721–22, 100 L.Ed.2d 178 (1988).

**2.** Flashing material is a barrier designed to intercept water which penetrates the external surface of the wall system. By diverting water to the outside of the building, the flashing prevents it from penetrating the building's interior.

cause of warping and the porous nature of the existing wooden windows, they no longer provided an adequate seal with the exterior wall; as such, the windows themselves served as a point from which water penetrated the Marlyn. As a result, re-inserting the existing windows after installation of new flashings would only lead to continued water penetration of the interior wall system.[3]

Arguing that the Marlyn's governing instruments designate windows as part of each owner's unit and that the Board has no authority to replace part of an individual unit, a group of unit owners ("McDowell") sought to halt the renovation project. The trial court agreed and therefore enjoined the Board from "replacing any of the existing windows." [4] The Board appeals.

## II

## A

The parties agree that rights with respect to repair and replacement of the windows must be found within the context of statutory law and the Marlyn's governing instruments, namely, the Declaration of the Marlyn Condominium ("Declaration") and the By–Laws of Marlyn Condominium, Inc. ("By–Laws").[5] There is also agreement that under the Declaration, the windows in a unit are part of that individual unit and thus part of the fee simple of the individual unit owner.[6] The element of disagreement is whether, notwithstanding such individual ownership, the Board nonetheless may replace the windows in the course of the proposed project.

Determinative in resolving this legal issue are provisions governing two aspects of the "little democratic subsociety" [7] that a condominium represents; namely, those dealing with maintenance and repair and those dealing with a related right of access. The statutory provision cited to us and to the trial court by both parties, D.C.Code section 45–1847(a) (1986) [hereinafter "sec-

**3.** The record also reveals other possible reasons, apart from the water penetration problem, for installing new windows. Due to deterioration, many existing storm windows could no longer be adequately secured to the building. The danger that the storm windows might fall off the building posed a safety threat. The Board also apparently took the view that because of the severely deteriorated condition of the existing windows, aesthetic concerns would justify replacement even if no water penetration problem had developed.

**4.** The trial court also enjoined the Board from going forward with the portion of the renovation project contract which called for the replacement of patio doors in the Marlyn. Like windows, patio doors are designated part of each individual owner's unit. However, the record does not reveal the reasons for replacing the doors. If they are being removed to provide access to common elements and cannot then be re-installed, our disposition of the case today applies equally to the patio doors as to the windows. As we indicate below, however, if removal and replacement of the doors is not required to repair damage sustained in the course of obtaining access to common elements, the Board may not have authority to order such work. With that caveat, we include patio doors within the term "windows" for purposes of this appeal.

**5.** Under District of Columbia law, "[t]he condominium declaration, bylaws, sales agreements,

and the relevant statutes must be construed as a whole." *Johnson v. Fairfax Village Condominium IV Unit Owners Ass'n,* 548 A.2d 87, 91 (D.C.1988). Should any conflict emerge among these sources of authority, the declaration controls over the by-laws. D.C.Code § 45–1817 (1986). However, "a construction consistent with [the District of Columbia Condominium Act] controls in all cases over any inconsistent construction." *Id.*

**6.** The parties also agree that the Declaration designates the exterior walls of the Marlyn, including the portion into which new flashings would be installed under the renovation project, as part of the common elements for which the Board has responsibility. The Declaration contains the typical division of real property in a condominium into three parts: 1) common elements, such as hallways, elevators, and the lobby, in which each individual owner has an undivided percentage interest; 2) limited common elements, such as patios or balconies, which are owned as common elements but which are not used by all the condominium residents; and 3) the individual unit itself, which is held in fee simple by each individual owner. *See* 1 P. RO-HAN & M. RESKIN, CONDOMINIUM LAW AND PRACTICE § 6.01[1], at 6–2 to 6–5 (rev. ed. 1989).

**7.** *Johnson v. Hobson,* 505 A.2d 1313, 1317 (D.C. 1986) (quoting *Hidden Harbour Estates, Inc. v. Norman,* 309 So.2d 180, 182 (Fla.Dist.Ct.App. 1975)).

tion 1847(a)"],[8] deals with these matters:

> Except to the extent otherwise provided by the condominium instruments, all powers and responsibilities with regard to maintenance, repair, renovation, restoration, and replacement of the condominium shall belong: (1) To the unit owners' association in the case of the common elements; and (2) to the individual unit owner in the case of any unit or any part thereof. Each unit owner shall afford to the other unit owners and to the unit owners' association and to any agents or employees of either such access through such unit owners' unit as may be reasonably necessary to enable them to exercise and discharge their respective powers and responsibilities. But to the extent that damage is inflicted on the common elements or any unit through which access is taken, the unit owner causing the same, or the unit owners' association if it caused the same, shall be liable for the prompt repair thereof.

The Declaration also grants the Board "a right of access to each Unit ... to maintain, repair or replace the Common Elements contained therein or elsewhere in the Building." Declaration, art. III(g).[9] Provisions for maintenance and repair, however, are primarily found in the By–Laws. The relevant subsection cited to us is that found in article VIII, section 5(a), which in pertinent part provides:

> The Board of Directors shall be responsible for the maintenance, repair and replacement ... of the following ...

(1) All of the Common Elements, whether located inside or outside of the Units.

. . . .

(4) All incidental damage caused to any Unit by such work as may be done or caused to be done by the Board of Directors.

**B**

■ In finding the Board lacked power to replace the windows, the trial court focused almost exclusively on the maintenance and repair provisions of the Marlyn's By–Laws. As the trial court construed article VIII, section 5(a), the Board could remove and replace the windows only if "replacement of the windows is incidental to the board carrying out its responsibility in maintaining the common elements and specifically repairing and perhaps replacing some of the things around the windows, flashings, et cetera, that are now so deteriorated that water is in fact leaking into the interior walls." In deciding whether the window replacement project was incidental to the Board's efforts to repair the common elements in the exterior wall system, the trial court determined that replacement of the windows reflected a "substantial portion" of the cost of the renovation project and represented "a substantial and basic part" of the "tasks that have to be undertaken to bring the Marlyn up to par." It therefore concluded that installation of new Pella windows could not be deemed "incidental" to the Board's duty to maintain the common elements as contem-

---

8. In treating this section as applicable, although it was enacted several years after the establishment of the Marlyn as a condominium, the parties have presumably engaged in the "acquiescence" or consent contemplated in *Fairfax Village, supra* note 5, 548 A.2d at 91. In any event, a repair duty linked to the right of access, such as that in section 1847(a), might be read into the Marlyn's instruments themselves. *See infra* note 10.

9. Elsewhere the Declaration states that each unit owner holds his or her unit subject to [a]n easement through the Units and the Common Elements for maintenance, repair and replacement of the Units, the Common Elements, or when repairs reasonably appear to

be necessary for public safety or to prevent damage to property other than the Unit. Declaration, art. III(b)(2). The By–Laws similarly provide:

*Right of Access.* An Owner shall grant a right of access to his Unit to the Board of Directors ... for the purpose of correcting any condition originating in his Unit and threatening another Unit or the Common Elements....

By–Laws, art. VIII, § 9. The Marlyn did not argue that the terms of these two provisions encompass authority to replace without owner consent the windows in individual units, either after access or more generally to prevent damage to common elements, and we therefore do not reach that issue on this appeal.

plated by article VIII, section 5(a)(4) of the Marlyn's By–Laws. As such, the trial court decided, the Board lacked any authority to replace the existing windows.

In challenging the trial court ruling, the Board argues that its duty to maintain common elements implies a general power to repair or replace part of an individual unit without the owner's approval where such an intrusion on the owner's property is necessary to maintain the common elements. To the extent the Board claims such an implied power from article VIII, section 5 of the By–Laws, we reject this contention for what is essentially a right of self-help. Under this provision of the Marlyn's instruments, the owner is responsible "for all damages to any and all other Units or to the Common Elements resulting from his failure" to make necessary repairs to his unit. By–Laws, art. VIII, § 5(b). Thus, if conditions in a unit cause damage to other parts of the condominium, in the absence of a need for access to the common elements, it is the individual owner's responsibility to make repairs. If the owner is reluctant to meet his obligation to make such repairs, the Board is authorized by both article XIII, § 1(a) of the By–Laws and D.C.Code § 45–1819 to bring legal proceedings to compel the owner to comply. That is the extent of the Board's authority flowing from the maintenance and repair provisions in article VIII, section 5 of the By–Laws relied on here by the Board. Because any authority granted to the Board limits an owner's "traditional individual ownership rights and privileges," condominium instruments must be "strictly construed as they are written, giving the language its clear, simple, and unambiguous

meaning." *Fairfax Village, supra* note 5, 548 A.2d at 91. *See Montgomery v. Columbia Knoll Condominium Council of Co–Owners,* 231 Va. 437, 439, 344 S.E.2d 912, 913 (1986) (where windows were part of individual units, condominium owners' association lacked authority to install new insulated windows, even if arguably in " 'the best interest of all the [unit] owners' ").

■ However, we agree with the Board that the trial court, in focusing almost exclusively on the maintenance and repair provisions of the By–Laws, failed to give sufficient legal weight to the access and repair provisions of section 1847(a). *See Fairfax Village, supra* note 5, 548 A.2d at 91 (declaration, by-laws and statutes must be "construed as a whole"). The statutory access provision grants the Board access through individual units where such access is "reasonably necessary" to enable the Board to carry out its obligation to repair common elements. The statutory repair provision requires the Board to repair damage "inflicted on ... any unit through which access is taken." [10]

The window replacement project in this case appears to fall within these access and repair provisions. As to the question of access, the trial court explicitly found that the Board could not get at the common elements in the walls where new flashings were to be installed without first removing the windows. As to the question of repair, the trial court suggested that the original windows, once removed, could not be re-inserted because of their old and deteriorated condition. Thus, the installation of new

---

**10.** A similar scheme might also be mandated by certain sections of the Marlyn's governing instruments. *See supra* note 9 and accompanying text. Like section 1847(a), the instruments extend to the Board the authority to gain access through parts of an individual unit when necessary to repair common elements. The instruments also might be read to impose on the Board a duty to repair any damage inflicted in the course of gaining such access. As in section 1847(a), the Board's duty under article VIII, section 5(a)(4) to repair "incidental damage caused to any Unit by such work as may be

done or caused to be done by the Board of Directors" could extend to all damage concomitant to taking access through a unit to repair damage to the common elements. Clearer language might well be expected in order to grant the Board a right to damage an individual unit in the course of gaining access to a damaged common element, but obligate the Board to repair such damage only if it were of "incidental," *i.e.,* minor, consequence. We need not definitively determine the operative effect of the condominium instruments standing alone.

windows may represent the only way for the Board to undo the damage inflicted while gaining access to the exterior wall system.[11] As such, under the unique circumstances of this particular renovation project, the Board may be required to replace the existing windows with new ones.

Because the trial court did not give sufficient weight to the Board's right of access and concomitant duty to repair, whether found in section 1847(a) or in the Marlyn's instruments, its ruling was not guided by the terms of the provisions creating those rights and duties. Although the trial testimony strongly suggests that the Board is authorized to replace most if not all windows under the access and repair provisions,[12] we cannot confidently conclude on the basis of this record that the trial court's statement that the existing windows could not be re-installed applies to all of the Marlyn's windows. Nor can we confidently discern the precise reason why the existing windows cannot be re-installed. If a new window must be installed because re-installation of the existing window is not feasible, the access and repair provisions allow—indeed, require—the Board to install the new window. If, however, the only basis for installing a new window is to form a better seal to prevent damage to the common elements, or for aesthetic or safety purposes, *see supra* note 4, the Board may not unilaterally do so over the opposition of the unit owner, at least not pursuant to a power implied from the Board's duty to maintain common elements as argued on this appeal, without legal action or by amendment of the By–Laws.

Accordingly, we must remand for further proceedings consistent with this opinion.

---

**11.** We do not understand McDowell to argue that the specifics of the proposed window replacement are excessive or unreasonable.

**12.** If the Board is so authorized to replace the windows, absent evidence of pretense, it is of no moment that installation of the new Pella windows might also be justified for reasons pursuant to which the Board would not be authorized to act. Nor is it of any import that the Board anticipated the need to repair windows which would be damaged in the course of gaining access to the common elements by contracting in advance for the installation of new windows. We likewise do not reach here such considerations as economies of scale, allocation of project costs, joinder of legal actions, and the like, which may be relevant in fashioning an appropriate order on remand.

*No. 89–286 reversed and remanded.*

*No. 89–505 dismissed.*