T.J. JEMISON, et al., Appellants,

v.

NATIONAL BAPTIST CONVENTION,
USA, INC., et al., Appellees.

NATIONAL BAPTIST CONVENTION,
USA, INC., et al., Appellants,

v.

T.J. JEMISON, et al., Appellees.

Nos. 95–CV–972, 95–CV–973, 95–CV–
1031, 96–CV–414, 96–CV–415,
96–CV–593, 96–CV–620.

District of Columbia Court of Appeals.

Argued June 3, 1997.

Decided Nov. 5, 1998.

Jerry A. Moore, III, and John D. Maddox, Washington, DC, for appellants T.J. Jemison and Jo A. Fleming.

Philip J. Harvey, Washington, DC, for appellant Felix N. Nixon.

Clifton S. Elgarten, with whom Laurel Pyke Malson, James J. Regan, Amy J. Mauser, and Monica G. Parham, Washington, DC, were on the brief, for appellees, National Baptist Convention, USA, Inc., and Henry J. Lyons, et al.

Before TERRY and REID, Associate Judges, and KING, Associate Judge, Retired.*

TERRY, Associate Judge:

The Alabama State Baptist Missionary Convention, Inc., and its president, Dr. Felix Nixon, filed a complaint against the National Baptist Convention, USA, Inc. (NBC), and others, alleging breach of contract and seeking injunctive relief. Along with the complaint, they filed a motion for a temporary restraining order (TRO) to prevent the transfer of authority from NBC's prior president, Dr. T.J. Jemison, to its newly elected president, Dr. Henry Lyons, because of allegedly defective election procedures at the September 1994 NBC convention in New Orleans.

The trial court eventually granted the motion of NBC and Dr. Lyons for summary judgment. No party contests the merits of that decision. The court then turned its attention to the motion of NBC and Dr. Lyons for sanctions based on improper affidavits offered in support of the original request for a TRO. There followed numerous depositions, additional discovery, and evidentiary hearings over a period of several weeks. About five months after the last hearing, in a thorough and meticulously detailed 61–page order, the court found Dr. Nixon, Dr. Jemison, Jo A. Fleming, Esquire (Jemison's attorney),[1] and the former board of directors of NBC under Dr. Jemison jointly and severally liable for $150,000 in punitive damages for "perpetrating a gross and serious fraud against the court." The court imposed additional sanctions on the same individuals by directing them to reimburse NBC and Dr.

---

* Judge King was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1998.

1. Ms. Fleming practices law in Baton Rouge, Louisiana, and is a member of the Louisiana bar.

Lyons for their attorneys' fees, costs, and expenses, the amount of which was yet to be determined.[2]

In a second order, issued after further submissions relating to attorneys' fees, the court awarded NBC and Dr. Lyons $237,322.00 for their attorneys' fees, costs, and expenses. The court also denied Jemison and Fleming's motion to alter or amend the judgment under Super.Ct.Civ.R. 59(e), their separate motion for reconsideration, and their motion to strike evidence. Nixon, Jemison, and Fleming appeal from both the award of punitive damages and the imposition of sanctions. We affirm.[3]

## I. FACTUAL BACKGROUND

NBC held its annual convention in New Orleans in September 1994 to elect a new president, officers, and members of the board of directors. The term of the former president, Dr. Jemison, would expire at the end of the convention, and he was barred by a term limitation in the NBC constitution from running for a new term. Dr. W. Franklyn Richardson was Jemison's choice for a successor, and Dr. Nixon also supported Richardson. There were, however, three additional candidates for the presidency, including Dr. Henry Lyons.

This was the first time in the history of NBC that the election was to be held by a secret ballot. To conduct the election, each of the four candidates chose two representatives to a multi-partisan Election Committee, which selected Rev. James S. Allen as its chairman. Under procedures adopted by the Committee, each delegate was required to obtain a badge and an identification card before proceeding to the voting booth. The Election Committee was to distribute the identification cards on the basis of delegate registrations.

A problem arose in the initial distribution of cards to the Alabama delegation, which was the largest of the state delegations. There were 1127 Alabama registrants enti-

tled to vote, but only 511 cards were ready for distribution. After those 511 cards were distributed, the delegates who did not receive cards went to the Election Committee, which then directed that cards be distributed to all of the Alabama delegates who requested them, including Dr. Nixon. The voting proceeded without further incident, and the votes were tabulated by independent, professional election officials. Dr. Lyons was declared the winner of the election by a margin of more than 500 votes, and later he addressed the convention as its president. While the convention remained in session, no one complained that he or she had been denied the right to vote.

Although Dr. Lyons and the new board had assumed office upon election, Jemison asked Lyons for a month to complete some "paperwork" before turning over the organization's books and records. Lyons was thus separated from control of NBC's administrative offices and financial resources. Jemison, Nixon, and Fleming used this additional time to implement a scheme to prevent Lyons from serving as president.

Upon returning to Alabama, Nixon told Jemison that he was dissatisfied with the election. At Jemison's urging, Nixon called a special meeting of the Executive Board of the Alabama State Convention to obtain approval to file suit in the Convention's name contesting the election. Dr. Nixon presented to the Board a memorandum prepared by Jemison's attorney, Jo Fleming, which would serve as the foundation for the lawsuit. Ms. Fleming claimed to have reviewed the election records and determined that 616 delegates from Alabama had been denied their right to vote. A resolution was passed approving the suit.

Ms. Fleming then began making arrangements for the filing of the suit by Dr. Nixon, in which Dr. Jemison would purport to be the defendant and Fleming would be his counsel. Fleming called Demetrius Newton, an attor-

---

**2.** The court later modified its decision in part and ruled that the former board of directors of NBC would not be held liable.

**3.** NBC noted two protective cross-appeals, Nos. 95–CV–1031 and 96–CV–414, but they have not

been briefed, and at oral argument counsel for NBC told us that they would not be pursued. They are moot, in any event, in light of our decision in the other five appeals. The two cross-appeals are therefore dismissed.

ney who had previously represented the Alabama State Convention, to discuss where the suit should be brought. Some time later, Ms. Fleming called Newton again to say that the suit would be filed in the District of Columbia and that Dr. Nixon had retained R. Kenneth Mundy, a prominent Washington attorney (now deceased), to represent him.

Before any litigation was begun, Fleming and Mundy communicated extensively with each other by phone and facsimile machine. Ms. Fleming reviewed preliminary drafts of the complaint and the TRO application several days before they were filed. The twofold purpose of the TRO application was to persuade the court that there were serious problems with the election results and to obtain an order declaring Dr. Lyons not yet in office. The trial court later found that it was the defendants' and plaintiffs' "mutual objective to convince the court to defer ruling and to send the case to the Election Committee for resolution of the alleged election irregularities."

Fleming and Jemison, with the assistance of Nixon, began assembling documents to support their claims that more than 600 Alabama delegates had been denied the right to vote, that Lyons had not yet been officially installed as president, and that it was widely recognized that there were serious questions about the conduct of the election. To that end they prepared two letters, ostensibly signed by Nixon and Jemison and addressed to each other, which would be filed with the TRO application. Nixon's letter, dated September 27, 1994, stated that 600 Alabama delegates had been denied the right to vote. Jemison's letter in response, dated September 28, asserted that there were widely recognized problems with the election and that other prominent members of the convention supported his view. It was later established that Nixon's supposed letter was forged by Fleming and Jemison in Nixon's name, that Nixon never signed it, and that Jemison's purported "response" was written in an effort to create the basis for a TRO.

Appellants then initiated a campaign to persuade Rev. Allen, the chairman of the Election Committee, that there was a serious controversy over the election and that the Committee should take action to resolve this dispute. Rev. Boise Kimber, Dr. Richardson's campaign manager, told Allen about purported complaints and tried to persuade Allen to intervene. When Jemison also urged Allen to set aside the election, Allen yielded to the pressure. At Jemison's request, Allen wrote Jemison a letter acknowledging complaints about election irregularities and stating that his Committee would address them. In fact, the only people from whom Allen had heard any references to complaints were Jemison and Kimber. This letter, along with the fabricated Nixon–Jemison exchange of correspondence, was faxed to Mr. Mundy to be filed with the TRO application.

The complaint and the TRO application requested that the installation of the new officers be enjoined, leaving Jemison in power. NBC's constitution provided that the newly elected board would assume responsibility upon the recess or adjournment of the convention. However, the copy of the constitution that was attached to the TRO application was photocopied in such a way that the relevant passages of Article VI, § 1, referring to the duties of the newly elected board, were omitted. This copy of the constitution was among those documents provided to Mr. Mundy, Nixon's counsel, by Ms. Fleming.

To support their allegation that hundreds of Alabama delegates had been denied the vote, appellants presented more than forty "affidavits of disenfranchisement." All of these affidavits were false, and all but a few had been forged in the names of various Alabama citizens who never knew that their names were being used in this way. The affidavits were prepared, in part, with the aid of Rev. Tommy Lee Lewis, who had been appointed by Dr. Nixon to the Executive Board of the Alabama State Convention and had been made chairman of the committee to gather evidence for the lawsuit. The affidavits were sent to Mr. Mundy by Boise Kimber, Richardson's campaign manager. Throughout this time, Fleming and Jemison did not inform Dr. Lyons of their efforts.

On September 29, 1994, Mr. Mundy filed the complaint and the TRO application. Fleming and Jemison wrote to Mundy stat-

ing that they had received a copy of the complaint and the TRO papers and purporting to accept service on behalf of NBC. Fleming added that she had no objection to the scheduled hearing date for the TRO application and waived her presence.

On the basis of the fraudulent allegations and documentation, the TRO was granted on September 29 after an *ex parte* hearing before a judge of the Superior Court. Ms. Fleming then contacted Dr. Lyons, notifying him that the court's order barred NBC from installing the officers who had been elected on September 8. She instructed Dr. Lyons that the officers remained as they were before the election.

A status conference was scheduled before another judge a week later, on October 6. On the morning of October 6, however, Dr. Lyons filed a written submission indicating that the facts were not what they appeared to be. Following the status conference, the judge set a consolidated hearing on the preliminary injunction and the merits for October 26, but she denied appellants' request to order the Election Committee to resolve the asserted factual issues about the conduct of the election.

Dr. Lyons and the new board then entered the case as intervenors and filed a motion for summary judgment, based primarily on the First Amendment. By the time of the October 26 hearing, Dr. Lyons was able to present evidence that at least six of the affidavits were forgeries. He therefore filed a motion for sanctions, with supporting affidavits. At the hearing, the court granted the motion for summary judgment. The court then asked whether there was any additional evidence to be considered in connection with the motion for sanctions. After presenting the testimony of several witnesses, Dr. Lyons' counsel advised the court that Dr. Jemison might also have participated in the fraud. The court decided that it was appropriate to conduct discovery and scheduled a further hearing.

After discovery and two additional hearings, the trial court issued an order on June 26, 1995, stating in part:

Virtually every document submitted in support of the TRO, and to support the central allegation that six hundred (600) or more persons were denied the right to vote, though qualified to do so, is based upon manufactured, false, or forged evidence which was known to be false or should have been known to be false by the plaintiffs, the defendants, and their counsel.

The court found that Nixon, Jemison, Fleming, the Alabama State Convention, and the members of the former NBC board of directors had

orchestrated a collusive effort to invoke the jurisdiction of the court and to mislead the court into entering orders designed to prejudice the rights of parties who were not before the court. Because they acted jointly and corruptly in initiating and maintaining this action, and in preparing and in causing to be submitted to the court false, fabricated, and fraudulent documents, and in otherwise perpetrating a gross and serious fraud against the court in furtherance of their tortious scheme, the sanctions which the court shall impose will run jointly and severally against them pursuant to Superior Court Civil Rule 11 and the inherent authority of the court to regulate and to preserve the integrity of the judicial process.

From the inception, this action was without evidentiary support and was designed to allow a few to retain the reins of power and to control the hierarchy of the National Baptist Convention contrary to the Convention's mission, its principles, tenets, and Constitution.

The court specifically found that Dr. Nixon and the Alabama State Convention were "directly responsible for the false and fraudulent affidavits, since it was pursuant to their directive that Rev. Lewis prepared and collected the same. Similarly, Dr. Jemison, through counsel, also prepared at least two of the affidavits, if not more...." The court further found that Dr. Nixon "knew firsthand that the allegations ... of widespread election irregularities were not well grounded in fact," and that both Jemison and Fleming were likewise well aware of the fraudulent nature of the lawsuit.

On the basis of these and similar findings, the court assessed punitive damages in the amount of $150,000 against Dr. Nixon, Dr. Jemison, and Ms. Fleming. They were also ordered to pay all reasonable attorneys' fees, costs, and expenses of the intervenors, Dr. Lyons and NBC. Those costs were later determined to be $237,322.00.[4]

## II. THE COURT'S FINDINGS OF FACT

Appellants make numerous challenges to the trial court's findings of fact and conclusions of law. Most of them, reduced to essentials, are contentions that the evidence was insufficient to support the findings, and hence that the imposition of sanctions against each and all of them was legally erroneous. Intertwined with these assertions are others of a more purely legal nature. We will strive to address them all in this section of our opinion even though, strictly speaking, they are not all claims of evidentiary insufficiency.

Our standard of review is well established. In a case tried without a jury, we address legal issues *de novo*, but the judge's findings of fact can be reversed only if they are "plainly wrong or without evidence to support [them]." D.C.Code § 17–305(a) (1997); *see, e.g., Washington Medical Center v. Holle*, 573 A.2d 1269, 1284 (D.C.1990); *Simpson v. Chesapeake & Potomac Telephone Co.*, 522 A.2d 880, 885 (D.C.1987). Applying this standard, we hold that the findings as to each appellant are amply supported by the evidence.

### A. *Jemison's Involvement*

Dr. Jemison claims that because he was not a party to the underlying lawsuit, the court had no jurisdiction to assess attorneys' fees and punitive damages against him. The complaint names only a singular defendant, "National Baptist Convention, USA, Inc.," listing "President, T.J. Jemison, Sr." in lower-case letters as the person to be served with process. Similarly, the TRO application requests "enjoining the National Baptist Convention, USA, Inc." and does not mention Jemison. Dr. Jemison, however, does not offer any legal support for the proposition that the court has no jurisdiction to sanction a non-party, and we conclude, in the particular circumstances of this case, that the court had the power to do so.

The trial court's authority to sanction Dr. Jemison was based on his involvement in the fraudulent scheme and the filing of the suit that arose from it, even though he was technically not a party. Jemison arranged for the filing of a collusive lawsuit and was actively involved in the submission of forged documents to the court. The evidence showed that Jemison wired legal fees directly to Mr. Mundy, knowing that Mundy was filing the suit. Jemison also forwarded to Mundy a letter to himself from Dr. Allen, referring to complaints about election irregularities, in order to bolster the TRO application. This letter was written by Dr. Allen at the request of Dr. Jemison and simply acknowledged complaints that Jemison himself had made.

Probably the most egregious of Jemison's activities was the fabrication of an exchange of letters between himself and Nixon, which he hoped would lend credence to the suggestion of massive irregularities so as to require court intervention. The letter bearing Nixon's signature was never seen by Nixon; it had been forged by Jemison and Fleming. The letter signed by Jemison was carefully tailored to "respond" to the fabricated letter which purportedly came from Nixon. Both letters were then sent to Mr. Mundy, along with the letter from Dr. Allen.

Jemison contends (without citing a single case) that because he was not a named party to the litigation, the trial court had no power to impose sanctions on him for his involvement in the fraudulent activities which culminated in the filing of a collusive lawsuit. But whether he was or was not a party is not the real issue. Rather, as appellees point out, the issue is whether the trial court had personal jurisdiction over Dr. Jemison which

---

4. No sanctions, however, were imposed on the plaintiffs' counsel, Mr. Mundy. The court found that it was reasonable for him to rely on the representations of his client, and that a reasonable pre-filing inquiry would not have disclosed that the pleadings and other papers were not well grounded in fact. No one takes issue with these findings.

would enable the court to impose sanctions on him for his wrongful conduct.[5]

▮ We note, first of all, that Jemison never raised his "not a party" claim in the trial court until long after the sanctions order was entered. It first surfaced in his motion for reconsideration (which we shall address in part V of this opinion), filed more than eight months after issuance of the order. It is settled law that a lack of personal jurisdiction can be waived, and we conclude that Jemison waived it in this case by failing to raise it at any time before filing the motion for reconsideration. We agree with appellees that "one cannot, after receiving an unfavorable ruling from the trial judge, concoct objections for use on appeal." *Copeland v. Marshall*, 205 U.S.App.D.C. 390, 415, 641 F.2d 880, 905 (1980) (en banc).

But even assuming, for the sake of argument, that the claim was adequately preserved by its inclusion in the motion for reconsideration, we would have to reject it. The Supreme Court has stated that "if in the informed discretion of the court, neither the statute nor the rules are up to the task, the court may safely rely on its inherent power" to sanction those who engage in bad faith conduct in the course of litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Although in *Chambers* the sanctioned person was an actual party to the case, a recent case in the Ninth Circuit used similar reasoning to affirm the imposition of attorneys' fees against a non-party, in circumstances comparable to what we have here. *Corder v. Howard Johnson & Co.*, 53 F.3d 225 (9th Cir.1994), involved a dispute over the management of a private pension plan; the suit alleged a breach of fiduciary duty by the plan's investment advisor. After ruling on the merits of the underlying claim, the trial court awarded attorneys' fees against Gary Baugh, the president of the company that had established the plan. Even though he was not a party to the litigation "in his individual capacity,"[6]

the court found that Mr. Baugh had "induced the Beneficiaries to sue [the investment advisor] and was motivated to do so to spread the loss resulting from the Beneficiaries' action against him." *Id.* at 232. Expressly rejecting Baugh's claim that the trial court had erred in assessing attorneys' fees against him because he was not a party, the court held that "even in the absence of statutory authority, a court may impose attorney's fees against a non-party as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices." *Id.* (citations omitted).

Similarly, in *Lockary v. Kayfetz*, 974 F.2d 1166 (9th Cir.1992), *cert. denied*, 508 U.S. 931, 113 S.Ct. 2397, 124 L.Ed.2d 298 (1993), the same court affirmed the imposition of sanctions on a non-party corporation (PLF) which had

> contacted and organized the plaintiffs and paid for the litigation ... [and had] sometimes ... held itself out as the representative of the plaintiffs, sometimes as the employer of the plaintiffs' lawyers, and always as the entity directing the litigation and "calling the shots."

*Id.* at 1168. After the case was resolved against the plaintiffs, the trial court imposed sanctions

> on PLF, the entity which had controlled the litigation ... and was, in the court's view, responsible for the substantial abuse of the court system.

*Id.* at 1169. Relying heavily on *Chambers v. NASCO, Inc., supra*, the Court of Appeals upheld this ruling as a proper exercise of the trial court's "inherent powers to sanction PLF as the responsible entity." *Id.* at 1170.

We agree with the reasoning of the Ninth Circuit in these two cases and adopt it here. We hold that the trial court had the inherent power to sanction Dr. Jemison, given the clear proof of his flagrant abuse of the judicial process. Like Mr. Baugh in the *Corder* case and PLF in the *Lockary* case, Dr. Jemi-

5. Our dissenting colleague agrees that the court could permissibly order Jemison to pay attorneys' fees, but not punitive damages. Jemison, however, draws no such distinction. Rather, his contention is that because he was not a party, the court could not impose sanctions of any kind upon him.

6. Baugh had been named as a defendant only in his capacity as a trustee of the pension plan.

son was deeply involved in the fraudulent scheme from the very beginning. He took an active part in the planning of the litigation and in the preparation of the false documents on which the TRO request was based. The evidence clearly showed that Jemison, along with Fleming and Nixon, was at the very heart of the fraud. We reject his argument that the evidence was insufficient to support the court's imposition of sanctions.

## B. *Fleming's Involvement*

 Ms. Fleming likewise maintains that her involvement in the fraudulent activities was minimal, and that she therefore should not have been sanctioned. She asserts, for example, that she had nothing to do with the selection of Mr. Mundy as counsel for the suit that was filed in the District of Columbia. While it is quite possible that Fleming may not have made the final selection, the evidence showed that she was actively involved in choosing the venue for the suit and in finding Mr. Mundy. She was in direct contact with Mundy's office from the beginning, consulting about jurisdiction and TRO standards. After the TRO was obtained, there were numerous phone calls between Mundy's office and Fleming's office.

Fleming also contends that the evidence failed to show that she participated in the drafting of the complaint and the TRO application. She cites Mr. Mundy's statement that there were "several calls back and forth to myself and Ms. Fleming in which I was trying to identify who the members of the Election Committee were." Mundy went on to say that this "wasn't for the purpose of filing. [It was for] setting forth the grievances and asking for official action by the National Baptist Convention." The trial court could properly infer, as it did, that while there was no direct proof that Fleming participated in the drafting of the legal papers, the repeated calls and faxes between Fleming and Mundy showed that Fleming at least had some role in their preparation.

Finally, Fleming asserts that she had no knowledge that fraudulent affidavits were being collected or that any affidavits were to be submitted with the complaint and the TRO application. She states that Rev. Lewis and Rev. Kimber conceived the idea of affidavits, prepared them, and provided them to Mr. Mundy. Ms. Fleming, however, admitted preparing the single affidavit signed and submitted by Rev. Kimber. As the trial court noted, all of the affidavits are significantly similar in form, in format, and even in typeface to the Kimber affidavit. Furthermore, the Kimber affidavit had to have been prepared by someone with knowledge of the other affidavits. All of these facts support the court's finding that Ms. Fleming was involved in filing a collusive and fraudulent lawsuit.

## C. *Nixon's Involvement*

 Dr. Nixon claims that his role in the fraud was minimal, far less than that of the other participants. While that is true to some extent, we are satisfied that his involvement was sufficient for a bad faith finding and that he should therefore be subject to the sanctions imposed by the trial court.

Nixon asserts that he did not engage in any bad faith conduct, much less participate (as plaintiff) in a massive conspiracy with the defendants. He points out that the trial court found that he never saw the four dozen false "affidavits of disenfranchisement" which were filed with the court. The court also found that Nixon did not write or authorize the forged letter to Jemison which was attached to the complaint.

Despite these findings favorable to Dr. Nixon, however, the trial court also found that Nixon played a major role in the institution of the fraudulent lawsuit. It was Nixon who arranged the special meeting of the Alabama State Convention's Executive Board to obtain the board's approval of a suit challenging the election in its name. He helped to gain votes to support the suit by relieving certain officials of their positions and then appointing others to the board, including Rev. Lewis. Dr. Nixon presented to the Executive Board a memorandum, prepared by Ms. Fleming, which served as the "factual" foundation for the complaint. Fleming purported to document that 616 voters from Alabama had been denied their right to vote at the convention. Nixon knew that this memorandum had been fabricated and was

not accurate. He also told Mr. Mundy that more than 600 Alabama delegates had been denied the right to vote—the central allegation of the fraudulent complaint. Dr. Nixon then assigned Rev. Lewis the task of gathering false statements to support the suit.

While there is no way of knowing just how closely Dr. Nixon collaborated with Rev. Lewis in arranging for the forged affidavits, the fact that Nixon assigned the task amply demonstrates his role in the fraud. When one of the purported affiants, Rev. Willie McClung, approached Dr. Nixon about his forged affidavit, Nixon told him to "mind [his] own business." Although Nixon left the active management of the suit to Jemison and Fleming, he helped to provide the fabricated allegations upon which the suit was based and, when confronted with the fraud and forgery, did nothing to mitigate it in any way. The court found:

> The plaintiff, Dr. Nixon, knew firsthand that the allegations raised in the complaint and the application for TRO, consisting of mass denials of 600 or more eligible delegates' right to vote; the assertions that the new Board and President had not been installed; unspecified breaches of the Convention Constitution, and assertions of widespread election irregularities, were not well grounded in fact.

This finding is abundantly supported by the evidence.

■ Nixon also argues that the court could not award punitive damages without ·first assessing compensatory damages,[7] and that the court erred in awarding punitive damages because the trial court never considered evidence of his net worth. We reject both arguments. In this case the award of attorneys' fees was itself compensatory. In the context of bad faith litigation, repayment of the fees incurred in defending against the litigation is properly treated as compensatory damages. *See Chambers v. NASCO, Inc., supra*, 501 U.S. at 46, 111 S.Ct. 2123. Furthermore, under District of Columbia law, evidence of net worth is not always a prerequisite to an award of punitive damages. *See Town Center Management Corp. v. Chavez*, 373 A.2d 238, 246 (D.C.1977); *see also Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C.1995), *modified*, 681 A.2d 1097, 1098 (1996) (net worth must be shown only when punitive damages are based on the wealth of the person from whom such damages are sought), *cert. denied*, ── U.S. ──, 117 S.Ct. 1083, 137 L.Ed.2d 217 (1997).

#### D. *The NBC Constitution*

■ Jemison and Fleming claim that they had no knowledge of the altered excerpt from the NBC constitution filed by Mr. Mundy as an attachment to the TRO application. They also argue that the omissions from the constitution were simply faxing errors. Mr. Mundy's testimony, however, as well as his answers to interrogatories, showed that he specifically asked Ms. Fleming to send him a copy of the NBC constitution. The trial court was aware of the importance of the omitted language, and could reasonably find that the likelihood that this one crucial section would be inadvertently omitted was quite remote. The finding that the alteration of the constitution was deliberate and culpable is well supported by the record.[8]

#### E. *Mr. Mundy's Retainer*

The trial court found that Nixon asked Jemison to pay the attorneys' fees for the legal proceedings against NBC. Dr. Nixon had earlier advised the Executive Board of the Alabama State Convention that it would

---

**7.** In the District of Columbia, there must be at least a basis in the evidence for actual—*i.e.*, compensatory—damages before punitive damages may be awarded. *See, e.g, Maxwell v. Gallagher*, 709 A.2d 100, 104–105 (D.C.1998) (citing cases).

**8.** Jemison and Fleming also argue that the two purported letters from Nixon to Jemison and from Jemison to Nixon were not fabricated or fraudulent. Given the copious evidence of the fraudulent scheme, which we need not here re-

peat, this argument is essentially frivolous. We note also that Ms. Fleming's input into the letters is unmistakable, as the trial court concluded. There was evidence, for example, that in all her correspondence she placed "In re:" (rather than the more customary "Re:") in the middle of the page and followed it, after double spacing, with the subject. The forged Nixon letter of September 27 was prepared in Fleming's characteristic form.

not have to pay any money toward this litigation. Following Nixon's conversation with Jemison on September 28, 1994, Jemison sent $9,500 to Mr. Mundy in Washington. The court found that there were no documents or discussions supporting Nixon's claim that the retainer fee was a personal loan to him from Jemison, and ruled that the payment of the fee by Dr. Jemison to the attorney representing his purported adversary was improper.

 Appellants continue to assert that this money was simply a personal loan to Mr. Mundy. They contend that there was no evidence that either Dr. Jemison or Ms. Fleming was in control of Mr. Mundy and his handling of the lawsuit. We disagree. The evidence showed that Dr. Jemison wired the money directly to Mr. Mundy, knowing that Mundy was about to file the complaint and the TRO application. Suits in which one side pays both sides' fees are presumed to be collusive because "one of the parties has dominated the conduct of the suit by payment of the fees of both." *United States v. Johnson*, 319 U.S. 302, 304, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943). There was, as the trial court found, no evidence to rebut this presumption, and thus the court did not err in holding that the payment was improper.

### III. PUNITIVE DAMAGES

 Appellants assert that the trial court did not have authority to assess punitive damages as a civil sanction for bad faith litigation, citing *Synanon Foundation, Inc. v. Bernstein*, 517 A.2d 28 (D.C.1986). They misread *Synanon.* In *Synanon* we held that when a suit has been filed in bad faith, the court in its discretion may "award the entire legal expenses incurred by the defendant." *Id.* at 38. If the award of attorneys' fees is greater than the actual amount of expenses incurred, then to the extent that it exceeds that amount, "that award is not truly attorneys' fees at all but rather punitive damages

under another name." *Id.* at 39. This court did not say, however, that punitive damages could not also be awarded in addition to attorneys' fees, but only that a trial is a prerequisite to such an award:

> We do not suggest that an award of punitive damages would have been inappropriate in the present case, but such an award was not made, *nor could it have been absent a trial.*

*Id.* (emphasis added). Appellees argue, and we agree, that if there is a trial (or, as in this case, a trial-type hearing), then neither *Synanon* nor any other case bars an award of punitive damages in a case such as this.

 Appellees also assert that in this case "the trial court followed *Synanon* to the letter." Again, we agree. The court allowed generous discovery and held three evidentiary hearings, and when they were over, the court made express and detailed findings that each of the three appellants had acted with the malicious state of mind required for punitive damages. *See, e.g., Daka, Inc. v. Breiner,* 711 A.2d 86, 98–99 (D.C.1998); *Washington Medical Center v. Holle, supra,* 573 A.2d at 1284. Particularly when the activity in question contains the elements of a classic intentional tort, for which punitive damages are permissibly granted,[9] we see no reason why a court may not award punitive damages. *See, e.g., Weisman v. Middleton,* 390 A.2d 996, 999 (D.C.1978) (both attorneys' fees and punitive damages may properly be awarded on a malicious prosecution claim).

 "Whether punitive damages will lie depends on the intent with which the wrong was done, and not on the extent of the actual damages." *Washington Medical Center, supra,* 573 A.2d at 1284 (citation omitted). That intent has been described in a variety of ways, but its nature can be discerned from the language used in our case law.[10] The finder of fact can infer the requi-

---

9. In the District of Columbia, with rare exceptions, punitive damages are available only for intentional torts. *See Bernstein v. Fernandez,* 649 A.2d 1064, 1073 (D.C.1991); *Washington Medical Center v. Holle, supra,* 573 A.2d at 1284 n. 24.

10. "Punitive damages are warranted only when the defendant commits a tortious act 'accompa-

nied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury.'" *Washington Medical Center v. Holle, supra,* 573 A.2d at 1284 (citations omitted); *see, e.g., Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 372 (D.C.1993) ("evil motive

site state of mind from the surrounding circumstances; indeed, it is usually impossible to do otherwise, for direct evidence of that state of mind is rare. *See Robinson v. Sarisky,* 535 A.2d 901, 906 (D.C.1988).

The trial court found appellants' conduct to be of an egregious nature, accompanied by ill will and willful disregard of the rights of others. Throughout its opinion the court used such terms as "despicable," "collusive," "dastardly," "false and misleading," "pernicious and odious," "gross and serious fraud," and "a most serious fraud upon the integrity of the court" to describe what appellants had done. There was no exaggeration in this language. Appellants engaged in a collusive scheme characterized from the outset by · fraud and deception, subverting the judicial process itself in their outrageous efforts to overturn the results of a clearly valid election. The court found conscious and purposeful fraud with respect to both the overall scheme and many specific fraudulent or collusive acts, and the evidence abundantly supported those findings.[11]

Appellants further maintain that as a matter of law there can be no joint and several liability for punitive damages. They assert that there are strict limitations on the vicarious imposition of punitive damages which include "full knowledge of the facts" by the person being vicariously charged. *See Woodard v. City Stores Co.,* 334 A.2d 189, 191 (D.C.1975). Appellants argue that the trial court did not find that each individual against whom punitive damages were jointly and severally assessed had full knowledge of the culpable conduct of the others.

■■■ This court has held, however, that persons who jointly participate in wrongful conduct may be jointly and severally liable

for punitive damages. *See Harris v. Wagshal,* 343 A.2d 283, 289 (D.C.1975). In this case, in addition to finding joint and several liability, the trial court held that even if the actions of each appellant were to be considered separately, they would warrant the imposition of sanctions. After spelling out what each appellant had done to further the fraudulent scheme, the court concluded, "Their actions, whether viewed individually or jointly, resulted in a most serious fraud upon the integrity of the court, for which the imposition of sanctions is mandated and is wholly appropriate." We discern no factual or legal error in this ruling, especially in light of *Harris.*

■■■ Appellants further maintain that the award of punitive damages was really a disguised penalty for criminal contempt, imposed without the required notice or legal safeguards, and was thus plain error. We disagree; this was not a matter that called for criminal contempt proceedings, nor can the award be construed as a criminal penalty. An award of punitive damages to a private party based on a civil claim or claims is a civil penalty, not a criminal sanction to which criminal law protections apply. *See, e.g., BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574 n. 22, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (although civil penalties must meet due process requirements, "[t]he strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases"); *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 260, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) ("[a]wards of punitive damages do not implicate [Eighth Amendment] concerns"). "If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court.…" *Hicks*

---

or actual malice"); *Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.,* 492 A.2d 580, 593 (D.C.1985) ("outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights" (citations omitted)).

11. Appellants also contend that the trial court did not use a "clear and convincing" standard in awarding punitive damages, as required by *Jonathan Woodner Co. v. Breeden, supra,* 665 A.2d at 938. While the court did not specifically use that language, appellants never asked it to do so. We note, moreover, that the court's order was filed

almost three months before we decided the *Jonathan Woodner* case, at a time when the standard of proof was not yet settled. Because the issue was not timely raised in the trial court, we decline to consider it now, as we declined in similar circumstances in two prior cases, *Daka, supra,* 711 A.2d at 99 n. 25, and *Dyer v. William S. Bergman & Associates, Inc.,* 657 A.2d 1132, 1139 (D.C.1995). *See Jonathan Woodner,* 665 A.2d at 937 (discussing *Dyer*). That aspect of *Jonathan Woodner* has not been challenged here.

*v. Feiock,* 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). Because the punitive damages in this case were ordered to be paid to the appellees, not the court, and because the trial court emphasized that they were being awarded for "the severe harm caused" by appellants to Dr. Lyons and NBC, we find no merit in appellants' argument.[12]

For all of these reasons, we reject appellants' various challenges to the punitive damages award.

## IV. ATTORNEYS' FEES

■ Jemison and Fleming claim that at the time of the alleged violations, prior to June 1, 1995, Civil Rule 11 applied only to a party or attorney who signed and filed a motion or other paper. While this assertion is essentially correct, a court may nevertheless impose sanctions (albeit not under Rule 11) when it finds that the attorney or party has engaged in bad faith litigation, even if that person has not signed any court papers.[13]

This court recently addressed a similar situation in *Bredehoft v. Alexander,* 686 A.2d 586 (D.C.1996), in which we reversed an order imposing sanctions under Rule 11 because the sanctioned attorney did not sign the challenged pleading. In doing so, however, we made clear that if the trial court had made a finding of bad faith, it could have imposed sanctions under its inherent "authority to impose sanctions" for bad faith conduct regardless of whether the attorney had signed the papers. *Id.* at 589 (citing *Chambers v. NASCO, Inc., supra,* 501 U.S. at 45–46, 111 S.Ct. 2123); *accord, Chevalier v. Moon,* 576 A.2d 722, 724 (D.C.1990) (affirming award of attorneys' fees when trial court had made a finding that party had acted in bad faith by misrepresenting facts to judge orally at a hearing, even though Rule 11 did not apply because misrepresentations were not made in a written pleading).

■ In light of *Bredehoft* and *Chevalier,* we hold that, to the extent that the court relied on Rule 11, it erred insofar as neither Jemison nor Fleming had signed any pleading or other document on which the court's sanctions were based. We also hold, however, that any such error was harmless because the court also found that Jemison and Fleming had acted in bad faith and exercised its inherent authority—well founded in the case law (including *Bredehoft* and *Chevalier* )—to punish bad faith litigation, and because there was overwhelming evidence to support the court's findings.

■ Appellants also contend that the trial court erred when it relied on aggregated time entries in calculating the attorneys' fees. The Supreme Court has held that "the applicant ... should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Courts in the District of Columbia have never imposed a requirement of daily task-specific billing, even under statutes authorizing awards of "reasonable" attorneys' fees. "[T]he fee application need not present 'the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.'" *National Ass'n of Concerned Veterans v. Secretary of Defense,* 219 U.S.App.D.C. 94, 102, 675 F.2d 1319, 1327 (1982) (citations omitted).

Appellees' fee submission comported with the requirement that it provide sufficiently detailed descriptions of the work performed and the hours billed. The submission consisted of the daily time entries of each of the attorneys and legal assistants involved.

---

12. We agree with appellees that the imposition of sanctions in this case closely resembles an award of damages in a civil action for malicious prosecution or abuse of process. For such conduct, the law recognizes that courts may award both compensatory damages and punitive damages without criminal contempt protections. *See, e.g., Weisman v. Middleton, supra,* 390 A.2d at 999 (both attorneys' fees and punitive damages are "proper elements of [a] damage award" in a malicious prosecution case).

13. Appellants assert that the court erred "in holding that either Jemison or Fleming signed any filed document in violation of Rule 11." The court, however, never made any such finding; on the contrary, it was plainly aware that only the signer (or a client whose attorney filed a document on his or her behalf) can be liable under Rule 11.

These documents were prepared in the same manner in which the law firm maintained its time entries for billing purposes, and included a description of the activities performed by each attorney on a given day and the total time spent by each attorney on that day. The fee submission was accompanied by detailed explanatory affidavits, including an affidavit describing the overall services performed, particular staffing decisions, and "write-offs" made in the exercise of counsel's judgment. We are satisfied that the documentation supporting the calculation of attorneys' fees was sufficient to meet the requirements of *Hensley v. Eckerhart* and other relevant cases.

## V. THE MOTION FOR RECONSIDERATION

On June 26, 1995, the trial court awarded punitive damages against appellants in the amount of $150,000 and ruled that appellants would be liable for reasonable attorneys' fees, costs, and expenses, the amount of which would be determined after further proceedings. On July 20 they filed separate notices of appeal from that order. The court did not determine the precise amount of attorneys' fees and expenses until February 7, 1996, when it entered an order assessing those costs at $237,322.00. On February 29, 1996, appellants filed a motion to reconsider the court's June 26 sanction order. In an order dated April 10, 1996, the trial court held that the motion for reconsideration was untimely and declined to consider it.[14] Jemison and Fleming now contend that the court abused its discretion in so ruling.

■■■■■ The court's pre-trial order set a ten-day limit for filing motions for reconsideration. Appellants would thus have had to file their motion within ten days after June

26, 1995, in order to challenge the punitive damages award (as appellees contend), or, at the very latest, within ten days after February 7, 1996, in order to challenge the attorneys' fees award.[15] Because appellants failed to do either and failed to explain this failure, their motion filed February 29 was untimely, and the trial court did not err in refusing to address it.[16]

## VI. CONCLUSION

We find no reversible error in any part of the trial court's decision. Accordingly, in the five appeals of Jemison, Fleming, and Nixon, the orders before us for review are affirmed in all respects. The two cross-appeals noted by NBC are dismissed; see note 3, *supra.*

*It is so ordered.*

REID, Associate Judge, concurring in part and dissenting in part:

I fully support and join Judge Terry's opinion, except for that part which imposes the sanction of punitive damages against Dr. Jemison. I agree that the factual circumstances of this matter warrant sanctions. What is most troublesome for me, however, is the use of the court's inherent power to impose punitive damages, in addition to attorneys fees, as a sanction on a non-party.

The trial court's order of June 26, 1995, treats Dr. Jemison as a party. At the time plaintiffs filed their complaint, Dr. Jemison was not made a party to the litigation. On October 6, 1994, the trial court inquired whether Dr. Jemison "is the appropriate party in this case." On October 7, 1994, the trial court added additional defendants to the case, but did not include the name of Dr.

---

14. The court noted, nevertheless, that it had "already considered most of the issues raised in defendants' motion to reconsider in its previous orders."

15. Appellees additionally contend that the June 26 order was final and appealable, and that because appellants appealed from that order, they could not also file a motion for reconsideration. They are only partially correct. The June 26 order was final as to punitive damages, but it was not final with respect to attorneys' fees and costs, and thus to that extent it was not appealable. *See Marlyn Condominium, Inc. v. McDo-*

*well*, 576 A.2d 1346, 1347 n. 1 (D.C.1990) ("[a]n award of attorney's fees is final when the trial court has 'determined the quantum of attorney's fees to be paid,' not when the trial court 'merely establishe[s] entitlement to attorney's fees in an amount to be later determined'" (citation omitted)).

16. Even if the motion to reconsider is treated as a motion to amend the judgment under Civil Rule 59(e), appellants would still have had to file it within ten days after February 7. Because they did not, the motion was untimely under Rule 59(e).

Jemison in its order. Nor was Dr. Jemison identified as a party in plaintiffs' amended complaint. Despite appellees' argument that Dr. Jemison acted like a party and did not challenge the court's jurisdiction after receiving notice that sanctions would be sought against him, I find nothing in the record showing that Dr. Jemison was ever made a party to the suit in his individual capacity. Hence, I can only regard him as a non-party.

I agree that *Corder v. Howard Johnson & Co.,* 53 F.3d 225 (9th Cir.1994), which relied on *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), supports the exercise of the court's inherent power to award sanctions, in the form of attorneys' fees, against a non-party for the filing of a collusive lawsuit. I also agree that *Lockary v. Kayfetz,* 974 F.2d 1166 (9th Cir. 1992), *cert. denied,* 508 U.S. 931, 113 S.Ct. 2397, 124 L.Ed.2d 298 (1993), permitted sanctions, in the form of attorneys' fees, against a non-party based on misconduct, although some of the factual circumstances differed from the case before us.[1] However, in the absence of any authority, I am unwilling to affirm the exercise of the court's inherent power to award punitive damages, in addition to attorneys' fees, against a non-party. The Supreme Court has reminded us that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers, supra,* 501 U.S. at 44, 111 S.Ct. 2123. A double award of sanctions against a non-party, based solely on the inherent power of the court, creates an awesome weapon. I am not prepared to join in the creation of such an awesome weapon at this time.

1. *Lockary, supra,* involved a complaint "alleg[ing] regulatory takings, substantive and procedural due process violations and equal protection violations … [as well as] antitrust claims" in which plaintiffs "sought damages of $30 million ($10 million trebled under the Sherman Act), and declaratory and injunctive relief." 974 F.2d at 1168. The magistrate appointed as special master imposed sanctions on the non-profit corporation in the amount of $136,434.50. *Id.* at 1169. Because sanctions were imposed erroneously with respect to a procedural due process claim and an abstention motion, and because there were errors in the calculation of the attorneys' fees, the matter was remanded to the district court for recalculation of the amount of the sanctions. *Id.* at 1179.