Farzad MODIRI, et al., Appellants,

v.

1342 RESTAURANT GROUP,
INC., Appellee.

No. 04–CV–1386.

District of Columbia Court of Appeals.

Argued March 16, 2006.
Decided Aug. 10, 2006.

Robert W. Mance for appellant.

Richard E. Schimel, Bethesda, MD, for appellee.

Before FARRELL, RUIZ, and FISHER, Associate Judges.

FISHER, Associate Judge:

This case arises from breach of a lease of real property located at 1342 G Street, N.W. After conducting a non-jury trial, Judge Rankin entered judgment against appellant, a sublessee, for nearly half a million dollars in damages and fees. Appellant does not challenge the trial court's interpretation of the various leases or its calculation of damages. He contends, rather, that the court improperly applied the doctrine of collateral estoppel. Finding no legal error or abuse of discretion, we affirm.

## I.  Procedural Background

The property in question is owned by TomKat Limited Partnership, whose predecessor in interest leased it to Creative Hairdressers, Inc. Creative Hairdressers sublet the premises in their entirety to Benson J. Fischer, who assigned his interest to 1342 Restaurant Group, Inc., the appellee in this case. Appellee, in turn, sublet the first floor to a restaurant known as Katy's Kitchen and the second and third floors to Michael Modiri, the appellant.

Modiri's sublease specified that he was to use the premises for a therapeutic massage facility. According to appellant, he signed the lease at the request of his girlfriend, Ms. Lee, who did not have the necessary credit. Appellant claimed that he lived and worked in California, and that Ms. Lee ran the business, which the parties sometimes referred to as a tanning

parlor—Tan Q. Nevertheless, Ms. Lee's name does not appear on the lease, nor was there any evidence that appellant Modiri had sublet the premises to Ms. Lee.

On February 7, 2001, TomKat Limited sent Creative Hairdressers notice that it was in default of the master lease, alleging, in part, that Tan Q was being used for solicitation of prostitution. Soon thereafter, TomKat filed suit to terminate the lease of Creative Hairdressers. *TomKat, Inc. v. Creative Hairdressers, Inc.*, No. LT–10689–01. On May 10, 2001, Judge Turner, sitting in the Landlord and Tenant Branch of the Superior Court, found that "the spa was a front for prostitution" and concluded that Creative Hairdressers was in default of the master lease. Shortly thereafter, Judge Turner granted possession of the entire premises to TomKat, evicting Creative Hairdressers, Benson Fischer, 1342 Restaurant Group, Katy's Kitchen, and appellant. We affirmed that judgment on appeal. *Creative Hairdressers, Inc. v. Tomkat, Inc.*, Nos. 01–CV–798, etc. (D.C. May 13, 2003).

Under its sublease with Creative Hairdressers, appellee 1342 Restaurant Group became legally responsible for the damages and fees owed by Creative Hairdressers to TomKat. Appellant Modiri's separate lease provided that he, in turn, was obligated to reimburse appellee for those damages and fees. Appellee thus brought the instant action against Modiri to recover those sums and also to assert its own claims for damages and attorneys' fees resulting from Modiri's breach of his sublease. After a bench trial, Judge Rankin entered judgment in favor of the appellee in the amount of $494,055.35,[1] plus the

1. The trial court found appellant responsible for paying: accelerated rent in the amount of $154,600; late charges for overdue rent in the amount of $10,822; interest in the amount of $69,049.67; TomKat's litigation fees against

Creative Hairdressers in the amount of $81,500.78; Creative Hairdressers' settlement with TomKat in the amount of $120,000 for breach of the master lease; Creative Hairdressers' legal fees in the amount of $21,218;

costs of maintaining the action. In so ruling, Judge Rankin held that Modiri was collaterally estopped from asserting that the property was not used for purposes of prostitution, as that issue had been decided when TomKat sued Creative Hairdressers in the Landlord and Tenant Branch of Superior Court. Relitigation of that question was barred by the doctrine of non-mutual offensive collateral estoppel.[2]

## II.

### A. Legal Principles and Standard of Review

The doctrine of collateral estoppel, also known as issue preclusion,

> renders conclusive in the same or a subsequent action determination of an issue of fact or law when (1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum.

*Davis v. Davis*, 663 A.2d 499, 501 (D.C. 1995) (quoting *Washington Med. Ctr. v. Holle*, 573 A.2d 1269, 1283 (D.C.1990)). Whether the foundational requirements for applying this doctrine have been met presents a legal issue which we decide *de novo*. *Davis*, 663 A.2d at 501.

Collateral estoppel may be used offensively or defensively. "Offensive use of collateral estoppel occurs when a plain-

tiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party." *United States v. Mendoza*, 464 U.S. 154, 159 n. 4, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). When one who was not a party to the original suit invokes collateral estoppel to prevent relitigation of an issue by a party to the original suit or his privy,[3] application of the doctrine is called "nonmutual." *See Blonder–Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 349–50, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (overruling a prior decision requiring mutuality of parties in order to apply doctrines of res judicata and collateral estoppel). In some cases, such as this one, the doctrine is used both offensively and non-mutually—"non-mutual offensive collateral estoppel." In this brand of estoppel, "a plaintiff seeks to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff." *Ali Baba Co. v. WILCO, Inc.*, 482 A.2d 418, 421–22 (D.C. 1984). *See also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329–31, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (approving the offensive use of issue preclusion by a nonparty to a prior lawsuit conditioned on a showing of fairness); 18 James Wm. Moore, Moore's Federal Practice § 132.04[2][c][iii] at p. 132–162 (3rd ed.2006) (using the term "non-mutual offensive issue preclusion" to describe the doctrine approved in the *Parklane Hosiery* decision).

---

and damages for the premature termination of the first-floor restaurant's lease in the amount of $36,864.90.

**2.** Appellant Modiri asserts that the evidence presented in the trial of the current action was insufficient to independently support a finding that the premises Modiri rented were used for prostitution. Judge Rankin never reached that question, however, having con-

cluded that reconsideration of the issue was barred by the doctrine of collateral estoppel. We likewise do not reach the issue.

**3.** Although we discuss the concept at more length later in this opinion, we pause to explain that a "privy" is one "who is in privity with another." Black's Law Dictionary 1238 (8th ed.2004).

■ Proper application of non-mutual offensive collateral estoppel requires a two-step inquiry. In the first step, the trial court must determine whether a case meets the traditional requirements for invoking collateral estoppel. As noted, this is a decision we review *de novo. See Davis,* 663 A.2d at 501. However, we apply non-mutual offensive collateral estoppel "with some caution," *Newell v. District of* Columbia, 741 A.2d 28, 36 (D.C. 1999), because use of the doctrine in this manner presents additional "issues relating to the potential unfairness to a defendant. . . ." *Ali Baba Co.,* 482 A.2d at 422. *See Parklane Hosiery,* 439 U.S. at 329–31, 99 S.Ct. 645 (citing as examples of potential unfairness cases where plaintiffs adopt a piecemeal litigation strategy, cases where a defendant has little incentive to defend the first action, situations where there are inconsistent judgments, and situations where the defendant has procedural protections available in the second case that were not available in the original action). To guard against unfairness in this special context, the trial court adds a second step to its inquiry and considers the fairness of applying collateral estoppel to the facts of the case. *See Ali Baba Co.,* 482 A.2d at 423. We review the resolution of this second inquiry under an abuse of discretion standard so as "to grant trial courts broad discretion to determine when [collateral estoppel] should be applied." *Parklane Hosiery,* 439 U.S. at 331, 99 S.Ct. 645; *see Ali Baba,* 482 A.2d at 422 (endorsing the *Parklane* approach of granting trial courts broad discretion).

Using this two-tiered approach in *Udebiuwa v. District of Columbia Bd. of Med.,* 818 A.2d 160 (D.C.2003), we first concluded that the issue in question was actually litigated in a previous action, that it was determined by a valid and final judgment, and that it was essential to that judgment. *Id.* at 163. We then considered whether the "other conditions" outlined in *Parklane Hosiery* had been met and concluded that there had been no abuse of discretion in applying non-mutual offensive collateral estoppel. *Id.* at 163–64. *See also In re Yanke,* 225 B.R. 428, 435–36 (Bankr. D.Minn.1998) (applying Minnesota collateral estoppel law and requiring both the basic elements of collateral estoppel and a fairness inquiry); *Preferred Am. Ins. v. Dulceak,* 302 Ill.App.3d 990, 235 Ill.Dec. 974, 706 N.E.2d 529, 532 (1999) (inquiring whether "the minimum elements of the doctrine are satisfied *and* it is clear that no unfairness will result to the party being estopped" (emphasis supplied)); *DeLisle v. Avallone,* 117 N.M. 602, 874 P.2d 1266, 1270 (Ct.App.1994) ("When the movant has made a prima facie showing [establishing the foundational requirements for applying collateral estoppel], the trial court must consider the countervailing equities including, but not limited to, prior incentive for vigorous defense, inconsistencies, procedural opportunities, and inconvenience of forum . . . ." (quoting *Silva v. State,* 106 N.M. 472, 745 P.2d 380, 384 (1987), and citing *Parklane Hosiery,* 439 U.S. at 329–30, 99 S.Ct. 645)).

**B. The Foundation for Applying Collateral Estoppel**

When ensuring that the foundational requirements of collateral estoppel have been met, we apply the test quoted above and consider whether:

(1) the issue [was] actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum.

*Davis,* 663 A.2d at 501 (internal citations omitted). The first, second, and fourth elements of this test are easily satisfied.

The issue of whether prostitution was taking place on the premises was actually litigated and determined in the landlord-tenant action; indeed, Judge Rankin characterized it as a "core finding." This "determination was essential to the judgment" and that judgment was certainly final, having been appealed to this court and upheld in an unpublished memorandum of judgment. Of the four elements, only the third—whether there was a full and fair opportunity for litigation by the parties *or their privies*—presents any real issue in the present case.

The main thrust of Modiri's argument is that he was not a party to the landlord-tenant action and, therefore, cannot be bound by the decisions reached in that case. While it is true that appellant was not a party to the previous action, the third part of our test actually applies to "the parties *or their privies.*" *Davis,* 663 A.2d at 501 (emphasis supplied). *See Howard Univ. v. Lacy,* 828 A.2d 733, 736 (D.C.2003); *Newell,* 741 A.2d at 36; *Smith v. Jenkins,* 562 A.2d 610, 617 (D.C.1989). As explained in MOORE'S FEDERAL PRACTICE, the *Parklane Hosiery* criteria for assessing fairness "of course presume that the defendant (and party to be bound) in the second action was either a party in the prior action, *or was in privity with a party to the prior action,* and that issue preclusion is otherwise applicable." 18 *id.* at § 132.04[2][c][iii], p. 132–165 (emphasis added; footnotes omitted). The crucial question in this case is whether appellant Modiri was in privity with the original defendant, Creative Hairdressers.

"A privy is one so identified in interest with a party to the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case." *Smith,* 562 A.2d at 615. The "orthodox categories" of privies are " 'those who control an action although not parties to it . . .; those whose interests are represented by a party to the action . . .; [and] successors in interest." *Id.* (quoting *Lawlor v. National Screen Serv.,* 349 U.S. 322, 329 n. 19, 75 S.Ct. 865, 99 L.Ed. 1122 (1955)).[4] 18 MOORE'S FEDERAL PRACTICE § 132.04[1][b][iv] at p. 132–148 (defining the three types of "sufficiently close" relationships that establish privity as 1) a successor to a party's property interest; 2) a nonparty that controlled the

**4.** The legal concept of "privity" has evolved over the years. Traditionally, a privy was one who had a "derivative liability relationship." 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2d § 4448 (2002). Privity now includes "[s]everal overlapping concepts" that identify the parties to be bound by both claim and issue preclusion. *Id.* §§ 4448–62 (exploring the various relationships that can create privity).

Although we adopted a less formalistic and more equitable concept of privity in *Smith v. Jenkins,* it is helpful to note that Mr. Modiri also would qualify as a traditional privy of Creative Hairdressers. In property law, a privity relationship "denotes a mutual or successive relationship to the same rights of property." *District of Columbia Redevelopment Land Agency v. Dowdey,* 618 A.2d 153, 163 (D.C.1992) (internal citation omitted).

Creative Hairdressers held a lease to the entire building. It assigned its property rights to Benson Fischer, who assigned them to appellee, which assigned its rights to the second and third floors to Modiri. Thus, Modiri acquired in succession the same property interest in the second and third floors that was granted to Creative Hairdressers. *See Sarete, Inc. v. 1344 U St. Ltd.,* 871 A.2d 480, 495 (D.C.2005) (quoting from 1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES §§ 7:5.1[A] and 7:5.1[C][1][a] (5th ed.2004)) ("acqui[ring a] leasehold interest creates the privity of estate"). Furthermore, the assignment of property rights was accomplished by a series of leases, so the appellee had a contractual obligation to Creative Hairdressers and Modiri assumed certain of those obligations through his sublease. Modiri and Creative Hairdressers are, therefore, also linked by privity of contract.

original suit; and 3) a nonparty whose interests were represented in the original suit).

As the trial court recognized, Creative Hairdressers represented during the landlord-tenant action the same legal interest that Modiri now asserts. Creative Hairdressers defended the suit by attempting to demonstrate that Modiri was not conducting an illegal business. It should have been clear that if Creative Hairdressers lost and was evicted, the subtenants would, likewise, be evicted. Similarly, had Creative Hairdressers defeated the action, Modiri would have benefited.

Indeed, the attorney for Creative Hairdressers asked Modiri to testify about activities at the tanning/massage parlor, but Modiri declined, sending, instead, the manager he claimed was more familiar with the everyday running of the business. Although this witness was called to testify on behalf of Creative Hairdressers, its attorney later acknowledged that she virtually "made the case for prostitution." This turn of events required the attorney to "argue against [his] own witness" during closing arguments.

There is ample evidence that Modiri knew about the original landlord-tenant litigation. Modiri admitted that he was told of the prostitution allegations in early March, and Benson Fischer testified that he had several conversations with Modiri warning that eviction and serious financial repercussions would follow if Modiri was engaged in illegal activity. Fischer's recollection of these conversations is corroborated by a letter from Fischer to Modiri

dated March 6, 2001. Barry Haberman, the attorney for Creative Hairdressers, testified that he kept Modiri informed about the litigation, which commenced on March 17, 2001, and, as mentioned earlier, asked Modiri to testify. Although Modiri knew of the action no later than March and the landlord-tenant decision was not issued until May 10, Modiri made no effort to involve himself more formally in the litigation. He wanted as much as possible to keep his name out of the controversy. However, this reticence does not undermine the conclusion that Modiri shared a common interest in the litigation with Creative Hairdressers. *See Smith,* 562 A.2d at 617 ("Smith's nonparticipation in that suit does not negate the fact that he was in privity with parties who actually represented his interests. . . .").

■■■ The conclusion that Modiri's interests were aligned with those of Creative Hairdressers is driven home by the fact that they shared the same lawyer. Although Barry Haberman appeared on behalf of Creative Hairdressers in the landlord-tenant litigation, he and Creative expected that Modiri would pay his fees. Moreover, Haberman directly represented Modiri. Judge Rankin concluded that "Farzad Michael Modiri retained the services of Barry Haberman, Esquire, to participate in the landlord/tenant action on his behalf for the purpose of defeating the landlord's contention that illegal activities were occurring on the third floor of the leased premises." Modiri vigorously contests this finding on appeal, but it certainly is not clearly erroneous.[5] To the con-

---

5. Modiri admitted that he retained Haberman, but insisted it was for the limited purpose of fighting two citations in an administrative forum. He asserts that Haberman was not authorized to represent him in the landlord-tenant litigation between TomKat and Creative Hairdressers. Modiri cites Haber-

man's inability to produce a retainer agreement, *see* D.C. R. Prof. Conduct 1.5(b), as proof that the representation did not extend that far. However, we have long recognized that "neither a written agreement nor the payment of fees is necessary to create an attorney-client relationship." *In re Lieber,*

trary, it is solidly supported by the record. We therefore conclude that Modiri was in privity with the original defendant, Creative Hairdressers.

It is the very nature of non-mutual collateral estoppel that at least one party to the new lawsuit was not a party to the previous litigation. The case now before us appears somewhat unusual because *neither* the plaintiff *nor* the defendant was a party to the landlord-tenant litigation. Rather, each stands in privity with a party to that action. We have never faced this permutation of collateral estoppel in the District of Columbia, at least in a published opinion. However, decisions in other jurisdictions have upheld the application of collateral estoppel when a new plaintiff sued a new defendant. For example, in Iowa, a young man who was driving his father's automobile struck and killed a woman. *Dettmann v. Kruckenberg,* 613 N.W.2d 238 (Iowa 2000). A criminal trial of the son followed, and he was found guilty of vehicular homicide. *Id.* at 241. The victim's husband then filed a wrongful death action against the father, the owner of the vehicle. The Supreme Court of Iowa held that the father was in privity with his son and was, therefore, precluded from arguing in the wrongful death action that his son was not driving the car at the time of the collision. *Id.* at 249. The Iowa court identified several factors which persuaded it to hold that the father was in privity with his son.

> First, ... [the father] himself testified in the criminal case and therefore had the opportunity to present any relevant evidence concerning the driver issue. Second, an identity of interests existed between [father and son] at the time of the criminal proceeding. [Mr. Krucken-

berg], as [the criminal defendant's] father and the vehicle owner, had a great personal interest in seeing that all evidence relevant to [the criminal defendant's] defense was presented in the criminal trial. Additionally, [the father] should have been on notice that he was subject to potential civil liability ... concerning [the son's] fault in causing the accident.

*Id.* In *Dettmann,* therefore, a new plaintiff, the victim's husband, used a previously adjudicated issue of fact against a new defendant who stood in privity with the original defendant.

*A to Z Assoc. v. Cooper,* 161 Misc.2d 283, 613 N.Y.S.2d 512, 517 (N.Y.Sup.Ct.1993), is a trial court decision with some striking similarities to *Dettmann.* The plaintiffs, Thomas Andrews, an attorney, and Christ Zois, a psychiatrist, formed a partnership to market Gloria Vanderbilt Cooper's art and designs. They (and their partnership) sued for breach of contract, while Cooper counter-claimed for, among other things, fraud and breach of fiduciary duty. Her allegations were based on the actions of Andrews, who made "various improper payments to himself and others while acting as [Cooper's] lawyer and business manager." *Id.* at 519. Andrews faced disciplinary charges, and the bar found that " 'by early 1980, and with the able assistance of Dr. Zois, Andrews began misappropriating [Cooper's] assets and diverting them to himself and Dr. Zois." *Id.* Dr. Zois testified on behalf of his partner, but Andrews was still disbarred. Based upon the bar's findings and the legal principle that "an attorney's violation of his ethical duties to his client results in denial of all compensation," *id.,* the trial judge dis-

---

442 A.2d 153, 156 (D.C.1982). That a written agreement was not produced and that Modiri later refused to pay the majority of Haber-

man's bill do not establish that Judge Rankin's finding based on the credibility of oral testimony, was clearly erroneous.

missed the breach of contract claims brought by Andrews.

During the civil proceedings, Cooper sought to use the issues decided in the attorney discipline case both offensively and defensively. She invoked the finding that funds had been misappropriated to relieve her of any contractual obligation to pay the partners, and she argued that the findings of breach of fiduciary duty and misappropriation of funds barred relitigation of those facts in connection with her counter-claims. The court held that Cooper could use the findings not only against Andrews, the subject of the attorney discipline case, but also against Zois and the partnership, as privity existed—the activities of Andrews were performed on behalf of the partnership, his commissions were paid to the partnership, and a partnership is a traditional relationship of privity. Furthermore, the court found that Zois had participated in the disciplinary hearing; he was called as a witness and testified on Andrews' behalf, and "[d]ue to the serious allegations of misconduct committed by him [and various provisions of New York partnership law], Dr. Zois clearly had every incentive to assist Andrews in the disciplinary proceedings." *Id.* at 517. So, in *Cooper*, a new plaintiff (Cooper instead of the disciplinary board) sued different defendants (Zois and the partnership) that stood in privity with the original defendant (Andrews) and was allowed to use offensive collateral estoppel to prove essential elements of her suit.

Although it arose in a somewhat different procedural posture,[6] we also find the decision in *DeLisle v. Avallone*, 117 N.M.

602, 874 P.2d 1266 (Ct.App.1994), to be instructive. In *DeLisle*, a client hired an attorney to exercise a right of redemption of a mortgage. However, the petition for redemption was dismissed because the attorney had not filed it in a timely manner. After failing to overturn that ruling, the client sued the attorney for malpractice, and the trial court precluded the attorney from relitigating the issue of timeliness. *Id.* at 1268. The Court of Appeals upheld this application of collateral estoppel, concluding that the issue of timeliness had been actually litigated during the first case, when the attorney had been in privity with his client. *Id.* at 1270. Privity had been established because the attorney had "sufficient control over the prior case" and an "interest in the outcome of the redemption hearing." He knew that "an untimely filing could, and ultimately did, subject him to" liability. *Id.*

*Dettmann*, *DeLisle*, and *Cooper* parallel the case before us in several ways. Like the father in *Dettmann*, Modiri "had the opportunity to present any relevant evidence" concerning whether prostitution was taking place in the space he had leased. That Modiri chose not to testify (unlike the privies in *Dettmann* and *Cooper*), but instead sent the manager of the business, does not negate the fact that he was given the *opportunity* to present any relevant evidence. Secondly, as we have already discussed, there was a clear identity of interests between the original defendant, Creative Hairdressers, and appellant Modiri. This factor was also emphasized in *Dettmann*, *DeLisle*, and *Cooper*. Furthermore, the terms of his lease [7] put Mo-

---

**6.** In the case before us, neither the plaintiff nor the defendant was a party to the previous litigation. In *DeLisle,* by contrast, the client was a party to both suits. Nevertheless, *DeLisle* offers a helpful analysis of the privity relationship, and New Mexico shares our two-

step approach to applying non-mutual offensive collateral estoppel. *DeLisle,* 874 P.2d at 1269–70.

**7.** Paragraph 30 of the appellant's lease stated that he "shall pay to [1342 Restaurant Group]

diri on notice that he faced potential civil liability if the court determined that prostitution was occurring inside Tan Q. *Cf. DeLisle* (where the attorney knew that a finding of untimeliness could subject him to an attorney malpractice suit in the future). Thus, in the words of *Dettmann*, Modiri had, or should have had, "a great personal interest in seeing that all evidence relevant" to refute the allegations of prostitution was presented in the previous trial.

We need not agree with every aspect of the analysis in *Dettmann*, *DeLisle*, and *Cooper* in order to find those decisions helpful. They reinforce our conclusion that the foundational requirements for applying collateral estoppel have been satisfied because Modiri was in privity with Creative Hairdressers.

### C. Fairness of Applying Non-mutual Offensive Collateral Estoppel

■■■ In the second tier of the test, we review the fairness of applying non-mutual offensive collateral estoppel in the instant case. The factors we use were enunciated by the Supreme Court in *Parklane Hosiery* and endorsed by this court in *Ali Baba:*

(1) Whether the first suit was for a trivial amount while the second was for a large amount; (2) whether the party asserting the estoppel could have effected joinder between himself and his present adversary, but did not do so; (3) whether the estoppel is based on one of conflicting judgments, another of which is in defendant's favor; (4) whether there are significantly different procedural advantages available to the defendant in the second suit which could affect the outcome.

*Ali Baba Co.*, 482 A.2d at 423. As mentioned above, we review the application of these factors for an abuse of discretion. *Id.* at 422.

The trial judge conducted a careful analysis, and we perceive no abuse of discretion in applying non-mutual offensive collateral estoppel to the circumstances of this case. Although the landlord-tenant action was for a smaller amount than the instant suit, it sought over $200,000—by no means a trivial sum. Modiri knew, or should have known, that he would be responsible for indemnifying Creative Hairdressers under the terms of his lease.[8] As the current plaintiff was not a party to the previous action, it could not have effected joinder of Modiri. There are no conflicting prior judgments related to this issue, and Modiri has not demonstrated that he would enjoy procedural advantages that were not available when Creative Hairdressers was litigating the same issue. Additional factors discussed above (that Modiri had an opportunity to testify and that he retained the attorney who represented Creative Hairdressers) further demonstrate the fairness of applying in this litigation the previous finding that "the spa was a front for prostitution."

### CONCLUSION

We hold that the trial court properly precluded appellant from relitigating the question of whether prostitution was taking place on the leased premises. The judgment on appeal is hereby

*Affirmed.*

upon demand the costs, charges and expenses, including the fees and disbursements of attorneys, incurred by [1342 Restaurant Group] as a result of [Modiri's] failure to

perform one or more of [his] obligations under this Lease...."

8. *See supra* note 7.