*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 22-FS-569

IN RE PETITION OF S.U. & C.U.; C.J., APPELLANTS.

Appeal from the Superior Court
of the District of Columbia
(2021-ADASLD-000167)

(Hon. Andrea L. Hertzfeld, Trial Judge)

(Submitted February 7, 2023                    Decided April 13, 2023)

S.U. & C.U., *pro se*.

C.J., *pro se*.

Before DEAHL, HOWARD, and ALIKHAN, *Associate Judges*.

ALIKHAN, *Associate Judge*: Appellants S.U. and C.U. challenge the trial court's award of monetary sanctions against them. Because the trial court properly awarded these sanctions under its inherent powers, and because appellants' miscellaneous arguments lack merit, we affirm.

## I.     Factual Background and Procedural History

S.U. (a transgender man) and appellee C.J. (a cisgender woman) were involved in an interpersonal relationship from 2004 to 2016. During their

relationship, C.J. gave birth to four children: the first she conceived through intrauterine insemination, and the others through in vitro fertilization. S.U. is listed as the father on each child's birth certificate, and C.J. is listed as their mother.

Following the birth of their youngest, S.U. filed for sole legal custody of all four children in family court in West Virginia, where they lived. He contended that he and C.J. had signed agreements dictating that they would share custody of their first child and that he would have sole custody of the other three. The court found that S.U. had failed to present convincing evidence that C.J. had actually signed these agreements, and the court therefore refused to enforce them. After much litigation—and based on some troubling findings about S.U.'s behavior—the court granted sole physical custody to C.J. and suspended all visitation by S.U. except for telephone and Skype contact.[1]

S.U. appealed to the West Virginia Supreme Court of Appeals, which affirmed. After several additional appeals by S.U., the West Virginia Supreme Court of Appeals issued a memorandum decision "stress[ing] two important rulings" that it had made in its many prior decisions regarding this custody dispute. First, "there

---

[1] In one of its orders, the Superior Court noted that the West Virginia trial court later suspended all contact after S.U. violated that court's instructions. Although we do not necessarily call that finding into question, we do not rely on it, as support for it does not appear in the record on appeal.

was never a valid, enforceable gestational surrogacy agreement between [S.U.] and [C.J.]." Second, C.J. "is the legal mother of all four children."

Less than a month after the West Virginia Supreme Court of Appeals issued that decision, S.U. and his wife C.U. filed petitions to adopt the three youngest children in the Superior Court of the District of Columbia. All three sworn, notarized petitions are functionally identical. In them, S.U. first listed his residential address as "4035 Grant St NE, Washington, DC 20019," but crossed that address out and handwrote above it: "712 H St NE, Suite 1433 Washington, DC 20002." The petitions further allege that all three children had been living with S.U. and C.U. since 2016. At no point do the petitions mention C.J. or the West Virginia litigation.

Alongside each petition, S.U. filed (1) a gestational surrogate consent form that C.J. appears to have signed, and (2) a "Natural Parent's Affidavit Concerning Parentage." In the affidavit, S.U. swore that the second biological parent of the three children was an anonymous donor, and that the resulting embryos were transferred "into the uterus of a third-party gestational surrogate who gestated [his] children to birth." He further swore that "[o]nly [S.U.] and the anonymous donor can be the biological parents" of the three children. Like the petitions it supported, the affidavit makes no mention of the fact that the West Virginia courts had adjudicated C.J. to be the children's legal mother.

Based on the representations in the petitions and exhibits, the Superior Court granted all three adoptions. When C.J. learned of the orders, she moved to intervene. The court held a hearing on the matter, during which C.J. testified that (1) the three children had been living with her since February 2018; (2) they had not seen S.U. since August 2018; and (3) none of the children had ever been to the District of Columbia.

The court pressed S.U. and C.U. on whether they actually resided in the District. They admitted that the H Street address listed in their petitions was not a residential address, but a mail forwarding center. S.U. also acknowledged that the Grant Street house was only a short-term Airbnb rental—and that the children had never resided in the District. For her part, C.U. confessed that she had never lived in the District and intended to file her taxes in West Virginia.

The trial court then issued an order vacating all three adoption decrees. It found that neither S.U. nor C.U. had ever actually resided in the District and accordingly held that it had lacked jurisdiction to issue the decrees pursuant to D.C. Code § 16-301(b). S.U. and C.U. appealed that order, and we affirmed. *In re Petition of S.U. & C.U.*, No. 22-FS-98, Mem. Op. & J. at 2 (D.C. Nov. 15, 2022).

While that appeal was pending, the trial court held a hearing regarding an oral motion that C.J. had made for sanctions. C.J. attended the hearing, but S.U. and

C.U. did not. C.J. testified about S.U.'s attempts to file fraudulent lawsuits in multiple jurisdictions, recounting that S.U. had bluntly admitted to her that his purpose in filing these suits was not only to gain custody of the children, "but also to harass her and to financially drain her." The trial court fully credited C.J.'s testimony.

The court thereafter granted C.J.'s sanctions motion. It found that the petitions were "vexatious, harassing and duplicative[, and] were pursued in bad-faith." Specifically, it explained that S.U. and C.U. had "committed a fraud upon th[e] Court, perjured themselves in sworn documents and in testimony at the January 27, 2022 hearing, and attempted to use this Court's authority to circumvent the valid, final order of another court to kidnap [the three youngest children] from their lawful parent."

The court accordingly awarded C.J. $71,631.23, citing its authority to impose sanctions both under Super. Ct. Dom. Rel. R. 11, as well as its "inherent power." Of this amount, $62,534.23 went to fees C.J. incurred from work her attorney, Jeffrey Strange, had completed on matters for the Superior Court litigation and two directly related matters in West Virginia: S.U.'s demand that the West Virginia Supreme Court of Appeals honor the Superior Court's adoption decrees and S.U.'s emergency motion in West Virginia to obtain physical custody of the children following the

issuance of the decrees. The remaining $9,097 went to "travel, child care, and lost wages associated with [C.J.'s] travel to and appearances in this District." S.U. and C.U. timely appealed the sanctions order.[2]

## II.     Standard of Review

We review a trial court's sanctions award imposed under Super. Ct. Dom. Rel. R. 11—which is functionally identical to Super. Ct. Civ. R. 11—for abuse of discretion. *Bredehoft v. Alexander*, 686 A.2d 586, 594 (D.C. 1996). For sanctions imposed under a court's inherent powers, we review the trial court's predicate finding of bad faith for clear error, and its ultimate award for abuse of discretion. *Ginsberg v. Granados*, 963 A.2d 1134, 1137 (D.C. 2009); *Breezevale Ltd. v. Dickinson*, 879 A.2d 957, 967 (D.C. 2005).

## III.     Discussion

S.U. and C.U. raise a litany of arguments on appeal. We reject all of them and affirm the trial court's grant of sanctions.

### A.     Propriety of the Sanctions

S.U. and C.U. first argue that the trial court improperly imposed sanctions under Super. Ct. Dom. Rel. R. 11 because it failed to expressly consider certain

---

[2] The court also imposed a few other non-monetary sanctions, none of which S.U. and C.U. contest on appeal.

factors that we have suggested may be a mandatory part of the Rule 11 analysis. *See Williams v. Bd. of Trs. of Mount Jezreel Baptist Church*, 589 A.2d 901, 911-12 (D.C. 1991) (listing four factors the trial court "should" consider). Even assuming that the court's analysis would not pass muster under Rule 11's strictures, the court nevertheless permissibly used attorney's fees and costs to calculate a sanction under its "inherent power to police itself." *Upson v. Wallace*, 3 A.3d 1148, 1168 (D.C. 2010) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)).

Pursuant to that power, a "court may . . . award a sanction . . . to a prevailing party if the opposing party 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)). Unlike with Rule 11, a finding of bad faith is all that is required for a court to impose sanctions under its inherent powers. *In re Jumper*, 909 A.2d 173, 176 (D.C. 2006).

Trial courts enjoy "considerable latitude" in deciding the type of sanctions to impose under their inherent powers. *See Breezevale*, 879 A.2d at 967. Where a party has initiated an entire lawsuit in bad faith, the court may award all legal expenses incurred by the defendant. *Synanon Found., Inc. v. Bernstein*, 517 A.2d 28, 38 (D.C. 1986). But courts are not limited to awards of attorney's fees and costs; their ability to craft sanctions encompasses a significantly broader array of solutions.

*See Breezevale*, 879 A.2d at 967 (affirming dismissal of entire suit); *Auerbach v. Frank*, 685 A.2d 404, 409 (D.C. 1996) (suggesting that imposing an injunction prohibiting a party from filing a simultaneous lawsuit in another jurisdiction would be permissible as long as the party bore "a very heavy burden of justification"). Where a court imposes sanctions under both Rule 11 and its inherent powers—but lacks a sufficient basis to do so under Rule 11—we may nonetheless find the error harmless if we determine that the inherent sanctions award was not infected by the error, as we conclude is the case here. *Jemison v. Nat'l Baptist Convention, USA, Inc.*, 720 A.2d 275, 287 (D.C. 1998); *see Ginsberg*, 963 A.2d at 1137 (bad faith finding reviewed for clear error); *Synanon Found., Inc.*, 517 A.2d at 38 (sanctions reviewed for abuse of discretion).

A review of the trial court's order makes clear that the court issued its awards under both Super. Ct. Dom. Rel. R. 11 and its inherent powers. Drawing from the inherent powers standard, the court noted that it "ha[d] inherent authority to award sanctions in appropriate circumstances for intentional abuse of the litigation process," authority that "is supplemented by Rule 11." The court went on to explain that "the exercise of [its inherent] authority must be based upon a finding that a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons"—the very findings it expressly made later in its order. From this language, we surmise a clear intent by the trial court to impose sanctions under its inherent powers, and the

requisite finding that S.U. and C.U. had initiated these adoption matters in bad faith is well-supported by the facts recounted above. Whether the trial court satisfied the standard for Rule 11 sanctions therefore is of no matter.

## B.    Amount and Form of the Award

The court awarded C.J. a total of $71,631.23, some of which was compensation for the work Mr. Strange had undertaken in the instant case and in two directly related matters in West Virginia, and the rest of which went to reimbursing C.J. for personal costs associated with the litigation, including travel, childcare, and lost wages. Both the amount and form of that award were proper.

As to the amount, these expenses are well supported by the exhibits that C.J. submitted. One of them specifically set forth her personal costs, separated by type of expense (i.e., travel expenses, babysitting fees, and missed work). The other organized the amounts her attorney billed, separated by project. And two affidavits submitted by Mr. Strange explained his and his staff's hourly rates. We are thus satisfied that the record supports the amount of sanctions awarded. *See 1230-1250 Twenty-Third St. Condo. Unit Owners Ass'n, v. Bolandz*, 978 A.2d 1188, 1193 (D.C. 2009) (affirming award where the party "outlined the fees by the stages in the proceeding . . . and included references to the corresponding invoices").

As to form, given the trial court's wide discretion to craft a sanction to punish bad-faith litigators and deter improper future conduct, *Synanon Found., Inc.*, 517 A.2d at 37, we see no issue with ordering S.U. and C.U. to pay *all* of the costs C.J. expended in defending against this matter, including personal costs and payments made to her attorney, *see id.* at 38 (noting that "where a suit has been filed in bad faith, the court has discretion to award the entire legal expenses incurred by the defendant"). The court here acted well within its discretion in awarding C.J. these sanctions under its inherent powers.[3]

S.U. and C.U. argue that an award of attorney's fees was improper because C.J. appeared pro se in this case and was thus technically unrepresented by an attorney. Mr. Strange, whom she had employed to represent her in the many West Virginia actions, ghostwrote some documents for her, which C.J. then filed in Superior Court—and it is the cost of those ghostwritten documents that form a large

---

[3] Given this holding, we need not address S.U. and C.U.'s argument that these proceedings should have been governed by the Superior Court's Adoption Rules, not its Domestic Relations Rules.

part of the sanctions award.[4] S.U. and C.U. suggest that an award of "attorney's fees" for this work was improper, as C.J. was never actually represented by an attorney in Superior Court.

That argument fails in the context of this case—where the court awarded sanctions based on its inherent powers—because it makes no difference whether these expenses are properly categorized as attorney's fees versus any other kind of cost. While proper categorization would likely matter in the context of a fee-shifting statute expressly cabined to "attorney's fees," that is not the case here. *Cf. Upson*, 3 A.3d at 1165-68 (holding that an attorney who represents himself is not entitled to "attorney's fees" under Rule 11); *In re Estate of Mason*, 732 A.2d 253, 254 (D.C. 1999) (per curiam) (affirming the trial court's exercise of discretion in refusing to

---

[4] While we are using the term "ghostwriting," the D.C. Bar refers to the situation of "a lawyer who drafts a complaint or an appellate brief for a client to file *pro se*" as an example of an "unbundled service arrangement[]." D.C. Bar, Ethics Op. 330 (2005). The D.C. Bar has opined that this practice is permitted under the D.C. Rules of Professional Conduct and that the rules "do not articulate any requirement that attorneys must identify themselves to the court if they provide assistance to a *pro se* litigant in the preparation of documents to be filed in court." *Id.*; *see* ABA Comm. on Ethics & Pro. Resp., Formal Op. 07-446 (2007) (opining that lawyers may provide assistance to pro se parties without disclosing the nature or extent of their assistance); Ira P. Robbins, *Ghostwriting: Filling in the Gaps of Pro Se Prisoners' Access to the Courts*, 23 Geo. J. Legal Ethics 271, 286-89 (2010) (noting that as of 2010, approximately half of the states that had considered the practice had explicitly permitted ghostwriting of legal pleadings); Jona Goldschmidt, *In Defense of Ghostwriting*, 29 Fordham Urb. L.J. 1145, 1146-47 (2002) (outlining policy advantages of permitting ghostwriting).

award attorney's fees incurred before the attorney was admitted to the Superior Court pro hac vice).[5]  A court's inherent powers give it broad authority to craft sanctions that it deems will punish and deter bad-faith litigation.  *See Breezevale*, 879 A.2d at 967, 970; *Synanon Found., Inc.*, 517 A.2d at 38.  That certainly includes the authority to award all costs the prevailing party expended as a result of such litigation, regardless of whether those fees were attorney's fees qua attorney's fees.  Stated simply, Mr. Strange's fees were indisputably a part of C.J.'s litigation expenses, so the court could properly order their reimbursement as a sanction under its inherent powers.

S.U. and C.U. also assert that Mr. Strange's ghostwriting constituted the unauthorized practice of law, but that too fails.  First, they do not explain how that would provide a basis to deny *C.J.* reimbursement for expenses incurred in litigating this suit.  Second, and in any event, even if we assumed that Mr. Strange's ghostwriting did qualify as practicing law "[i]n the District of Columbia" pursuant to D.C. App. R. 49(b)(3) and D.C. App. R 49(b)(3) cmt., an attorney like Mr. Strange who is not admitted in the District is still permitted to "provide legal

---

[5] To be clear, we are not addressing the merits of this argument—whether fee-shifting statutes limited to "attorney's fees" permit an award of fees for ghostwritten work—one way or another.  We simply emphasize that it has no application where a court has granted sanctions under its inherent powers, which authorize much broader forms of relief than just attorney's fees.

services on a temporary basis . . . if the services . . . are in or reasonably related to a pending or potential proceeding before a court or other tribunal in another jurisdiction in which the person is admitted." D.C. App. R. 49(c)(13)(A). We thus see no barrier to the services Mr. Strange rendered here.

## C.    Remaining Arguments

S.U. and C.U. raise a host of additional arguments that warrant only brief attention. First, they claim that "[t]he sanctions imposed are unconstitutional because they penalize [them] for exercising [their] Fourteenth Amendment rights of due process, equal protection, and rights surrounding the parent-child relationship."[6] This is simply inaccurate. The trial court awarded sanctions based upon its well-supported finding that S.U. and C.U. initiated this suit in bad faith, and we have held that "there is no right to access the courts to conduct vexatious litigation." *In re Sibley*, 990 A.2d 483, 491 (D.C. 2010).

If S.U. and C.U. are claiming that they were denied procedural due process, that gets them no further. As long as a party is placed on sufficient notice that it may be subject to sanctions, the court may decide sanctions based only on the parties' briefings. *Breezevale*, 879 A.2d at 964-65. After the court placed S.U. and C.U. on

---

[6] The Fourteenth Amendment is not applicable in the District of Columbia, but due process and equal protection claims are cognizable under the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).

notice in its order vacating the adoption petitions that it was considering issuing sanctions against them, S.U. and C.U. filed two briefs contesting sanctions. That alone is sufficient process.[7] *Id.* What is more, S.U. and C.U. failed to attend the sanctions hearing (even though S.U. indicated that he would be available on the date it was scheduled) and they have not provided any excuse for their absence. *Chavis v. Garrett*, 419 F. Supp. 3d 24, 38 (D.D.C. 2019) (rejecting the plaintiff's due process claim because "[a]t no point d[id] she allege that she availed herself of relevant procedures available to her under District of Columbia law").

Second, S.U. and C.U. argue that the sanctions imposed by the court "give[] the appearance of vindictiveness." A thorough review of the record has unearthed nothing to suggest that the trial court harbored an impermissible bias against S.U. or C.U., as opposed to a desire to deter frivolous filings and fraud on the court.

Third, S.U. and C.U. contend that "[t]he entirety of [their] actions was permitted by D.C. Code § 16-301 *et. seq.*; D.C. Code § 16-401 *et. seq.*; 42 U.S. Code § 1983; and[] w[as] in-line [sic] with the Fourteenth Amendment." For the reasons stated above, neither the Constitution nor Section 1983 protects bad-faith, fraudulent

---

[7] To the extent that S.U. and C.U. suggest in their brief that they were never given a copy of C.J.'s updated fee exhibits—on which the trial court based its final award—that is belied by the record. In their second sanctions brief, they recite fee amounts that only appear in the updated exhibits.

litigation.  Neither does our adoption statute (Section 16-301 *et seq.*), nor our collaborative reproduction statute (Section 16-401 *et seq.*).  If S.U. and C.U. are trying to reargue, as they did in West Virginia, that C.J.'s name should not have been placed on the children's birth certificates, we must reject that argument because the issue was resolved in a final judgment in West Virginia, and we give that decision full faith and credit.  *See Nader v. Serody*, 43 A.3d 327, 336 (D.C. 2012).

Fourth, S.U. and C.U. contest the trial court's finding that S.U. was not a legal resident of the District.  But we already affirmed that finding in S.U. and C.U.'s prior appeal.  *In re Petition of S.U. & C.U.*, Mem. Op. & J. at 2.

Fifth and finally, S.U. and C.U. argue that res judicata bars some or all of the fees that C.J. sought.  They claim that she already requested compensation for the same fees in a West Virginia federal court, and that that court elected not to award fees for that work.  This is simply based on a false factual premise.  Neither the magistrate judge nor the district judge in the case S.U. and C.U. cite considered whether C.J. would be entitled to attorney's fees.  Omnibus R. & R., *[C.J.] v. S.U.*, No. 1:22-cv-3 (N.D.W.V. Mar. 18, 2022); Order, *[C.J.] v. S.U.*, No. 1:22-cv-3 (N.D.W.V. Sept. 30, 2022).  In fact, C.J. never even sought attorney's fees in that matter.  Docket, No. 1:22-cv-3 (N.D.W.V.); C.J. Mot. to Dismiss, No. 1:22-cv-3 (N.D.W.V. Feb. 11, 2022).  So the issue plainly did not receive the decision on the

merits that is required to apply claim or issue preclusion. *Modiri v. 1342 Rest. Grp.*, 904 A.2d 391, 394 (D.C. 2006); *Smith v. Greenway Apartments LP*, 150 A.3d 1265, 1272 (D.C. 2016).

## IV.    Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed.

*So ordered.*